The Liverpool, etc., Insurance Company vs. Creighton.

THE LIVERPOOL, LONDON AND GLOBE INSURANCE COMPANY, plaintiff in error, vs. J. H. & W. CREIGHTON, defendants in error.

1. An indorsement, amongst others, on a fire insurance policy, stating that in case of a difference of opinion as to the amount of loss or damage, such difference shall be submitted to arbitration, (although such indorsements are referred to in the body of the policy,) does not bar the insured of his right of action without such submission, unless the same is stipulated to be a condition precedent to his right to resort to the courts, or as the only mode by which the loss or damage is to be ascertained, or by which the liability of the company can be fixed.

2. But if one of the conditions so indorsed and referred to, be that the insurer is not liable for loss or damage by theft, at or after any fire, such stipulation is binding on the insured.

3. The evidence does not show that the goods and the store in which they were placed, were so taken possession and control of by the company or its authority, as to make it liable for the theft which is charged to have been committed.

4. Under the evidence, it was no abuse of discretion by the court in refusing a new trial on the ground that the goods were removed from the house in which they were kept without any necessity therefor.

5. Judgment is reversed and a new trial granted, with the privilege to defendants in error to write from the verdict and judgment the sum of $2,261 60, and upon the same being done, the judgment for the remainder shall stand affirmed.

Insurance. Conditions. Before Judge SCHLEY. Chatham Superior Court. January Term, 1873.

J. H. & W. Creighton instituted suit against the Liverpool, London and Globe Insurance Company on two policies of insurance, one for $10,000 00, and the other for $5,000 00, claiming as due them for damage by fire, and from said defendant's having taken possession of the insured property at said fire, and having failed to return the same, $7,131 76, besides interest.

The defendant pleaded as follows:

1st. That said contracts of insurance were made subject to certain conditions and stipulations indorsed on each of said policies, one of which was, "that in case of difference of opinion as to the amount of loss or damage, such difference

shall be submitted to the judgment of two disinterested and competent men, and mutually chosen, (who, in case of disagreement, shall select a third,) whose award shall be conclusive and binding upon both parties." That subsequent to the alleged loss, to-wit: on March 13th, 1871, there being a difference of opinion between the plaintiffs and the defendant as to the amount of the loss, the defendant offered to comply with said condition, and requested the plaintiffs so to do, which they refused.

2d. That the plaintiffs only suffered a loss by fire to the amount of $1,099 14, which the defendant has always been ready and willing to pay.

The following evidence was introduced for the plaintiffs:

1st. J. H. CREIGHTON, sworn: Witness is one of the plaintiffs. Kept a store at 174 Bay street, when the fire occurred in that block, February 27th, 1871. The day after the fire, found the key of the store in the possession of J. E. Johnston & Company, agents of the defendant. Witness could not get into the store until they opened it and let him in. Found goods in the store in dreadful condition. An estimate of loss was then made under agreement with Mr. Mims, one of the firm of J. E. Johnston & Company; he proposed that the goods should be arranged for examination by our clerks and others that he might send, at the expense of his office; this was done and paid for by him; a large amount of goods was found to be missing. An inventory of goods saved was taken, which amounted to $10,953 62. Foreign imported goods and domestic goods were kept separate on the books, because the Savannah house was allowed a *bonus* on foreign goods of twenty-five per cent., and this was therefore added to the invoice price in estimating the value of goods in store. The amount of goods in store before the fire, as appeared by the books, was $15,493 29; had received $37,804 61 in all up to the time of the fire; had sold $25,711 91; then deduct $18,000 00 and $4,539 00 would be the amount of goods missing. The damage to the goods saved was about

The Liverpool, etc., Insurance Company *vs.* Creighton.

fifty per cent., though we did not claim that amount; we claimed twenty-five per cent., equal to $2,738 40; after the statement had been made out it was found that a further deduction $140 31 should be made from the amount claimed on account of goods sold which did not appear on the books; the defendant offered to pay in full settlement about $2,500 00. When I found there was no prospect of a satisfactory settlement, I made out a sworn statement and left it at the office of the agents of the defendant; there was no dispute about the quality of goods in the store after the fire. The foreign goods kept by plaintiffs were of the best quality; domestic goods were such as are commonly found in Savannah. The invoice book and journal of plaintiffs presented to witness and identified by him.

*Cross-examined:* Hugh Creighton, one of the original firm, died in the fall of 1871; at the time of the fire my residence was seven miles from Savannah, where I went every night. Neither of the partners resided in the city; I heard of the fire next morning from Dixon, who went out to inform me, and I returned with him; I had to go to the office of the agents of the company to get the key of the store; I saw the key that morning, for the first time after the fire, in the hands of a man in their employ; I staid until one or two o'clock; they had commenced to put the goods in order: Dixon, Wilson and Catherwood were employed by the defendant to assist in putting the goods in order; don't know who else the defendant employed; never went back to the store until the goods were arranged; was absent from the city several days; Dixon came out to let me know when the work was done; some of the goods were received from the police barracks that had been captured when stolen; the goods found in the store had been damaged in carrying them out in the streets. None were burned and none wet, but they were dirty, trampled on and tossed about; the store was not burned. The defendant offered arbitration about damage—before inventory taken they agreed to pay for lost goods; after all the goods were fixed up, and it was found that the missing would amount to $4,000 or more, they declined to pay.

2d. JOHN Y. DIXON sworn: The fire occurred about eleven o'clock at night; I went promptly to it; our store was the sixth or seventh from that on fire; almost an entire block between; the fire finally extended to the store next to ours; I was clerk, salesman, general manager, etc., for plaintiffs; I opened the store, saw Daniels, clerk of the insurance agents, come in great haste; he said, "the company has a risk of $15,000 00; is Creighton about?" I asked him if he represented the agents, and he said yes, and asked what I thought about it; he then said these goods ought to be removed; I replied that I would agree to any thing he said, that I would be subject to his orders; the store was then opened, and he went in and took charge; I went in, also, at the same time; several others went in, and in a few minutes they commenced to move the goods; a good many volunteered to help move them; I helped myself, and sent Wilson and Catherwood to help; almost all the goods were removed. On receipt of a message, through an officer of police, said to be from General Johnston, one of the agents of the defendant, the doors were closed and the moving of goods stopped; some of the goods moved were put in a pile in front of the store by a tree, but there were many exceptions to the rule; I saw Mims the next day; I did not have control of the keys again for nearly two weeks; believe McNulty had the keys from the time he was employed to assist in making inventory; two or three parties were employed by Mims to fix up goods; Mims paid expenses of all this; Mims was one of the firm of J. E. Johnston & Company, defendant's agents. Foreign goods had a *bonus* in our favor of twenty-five per cent.; the defendant required the inventory to be taken to ascertain what goods were missing; inventory was of goods returned to the store; loss was ascertained by reference to the books, invoices, sales, etc.; books remained at the agents' office as long as they wanted them; inventory took from four to five days; those of us engaged in taking inventory had possession of store while it was going on; McNulty had the keys. On the morning before the fire, books showed goods

on hand $15,493 29; after inventory taken, $10,953 62—
amount of missing goods, therefore, $4,539 67; damage to
goods saved, in my opinion, was twenty-five per cent., equal
to $2,738 40; the damage was caused by rough handling,
trampling, dirt, etc.; many pieces were unrolled; Daniels
had goods removed because he thought the whole block would
be burnt; goods recovered from police barracks were put
back into store. I have been in the dry goods business over
eight years; while taking inventory, I frequently missed
goods that I knew were in store at the time of the fire.

*Cross-examined:* I was not present when goods were re-
turned to the store; I did not object to the removal of goods;
the pile of goods was around a tree in front of the store; I
was in the store and at the door while the removal was going
on; saw goods carried from the store, but don't know where
they went to; a one-horse wagon load of common goods, not
very valuable, that the police had captured, was recovered
from the police barracks; these goods were included in the
inventory taken after the fire. I made no demand for the
key; the first day that McNulty was at the store with me,
when we were about to leave for dinner, I took the key out
of the door; he at once asked me for it, and I gave it to him;
there were two keys and two locks, however; McNulty had
one and I one; neither of us could get into the store without
the other. I was employed by Mr. Mims in assisting in
taking the inventory; he said to Creighton, in my presence,
"If your clerks will assist, I will pay the expense;" inven-
tory was made at the joint expense of Creighton & Company
and the defendant.

3d. T. B. CATHERWOOD, sworn: I was present at the fire;
went with my brother, who was in the employ of plaintiffs;
found Dixon, Wilson and others there. A gentleman stepped up,
professing to represent the defendant, and inquired for Creigh-
ton; I told him he was not there, but pointed him to Dixon,
who represented the house; he asked Dixon if the goods ought
not to be removed, who replied, "That is as you say;" this

person then further said, "Then I say move;" the moving then began, and I helped for awhile. I went into the back room, where there was no light, and it was thronged with people; I saw goods thrown out of the back window, and went into the front room and told Mr. Daniels about it, and asked him if he was in charge of the store; he said he was; I said to him, you had better then go into the back room and see what was going on there; I told him I thought it was wholesale robbery, and that the defendant would have a sweet bill to pay; Daniels rushed at once into the back room to stop it, but as I did not go back there again, I saw no more of him. The goods that were carried out were thrown in a pile at the foot of a tree; I afterwards bought some damaged goods, some socks, from the plaintiffs at a reduction of thirty-three and a third per cent.

*Cross-examined:* When I arrived, Dixon was in a quandary; said if he moved the goods, he might affect his insurance, and if he did not move them and they should burn up, they might lose the insurance; just while we were talking about it, Daniels came up, when the conversation between him and Dixon took place. Don't know who the people in the back room were; Daniels rushed in there as soon as I told him about the goods being thrown out of the window.

4th. JOHN A. FEUGER, sworn: I was present at the fire; saw them removing goods from a store; asked if assistance was needed; being answered yes, I helped to move some boxes to a tree some distance in front of the store; I went away for a time, and then came back after awhile; many of the goods were tumbled in the mud and sand near the tree.

5th. The policies of insurance, in the usual form, were introduced. Each policy stated upon its face that the insurance was "subject to the conditions and stipulations indorsed hereon, which constitute the basis of this insurance." Among the conditions referred to, were the following:

"That this company will not be answerable for any loss or damage to stock or goods whilst undergoing any process in

which the application of fire heat is necessary—nor for loss or damage to goods in store windows occasioned by the lights in said windows—nor for loss or damage by explosion unless fire ensues, and then for the loss or damage by such fire only—nor for loss or damage resulting from neglect to use all possible efforts to save the property when on fire or exposed thereto, or after such fire—nor for loss or damage by theft at or after any fire.

"That in case of difference of opinion as to the amount of loss or damage, such difference shall be submitted to the judgment of two disinterested and competent men, mutually chosen, (who in case of disagreement shall select a third,) whose award shall be conclusive and binding on both parties."

The defendant introduced evidence as follows:

1st. L. MIMS, sworn: I am one of the firm of J. E. Johnston & Company; remember the fire of 22d February, 1871; did not hear the alarm during the night, and only learned it next morning about nine o'clock when I reached my office; Creighton came there nearly about the same time; he proposed to abandon the goods to the insurers; I positively refused this, and said that we wanted the loss properly adjusted; I went with him at once to the store to ascertain the condition of things; understood him to agree that the usual steps should be taken to fix the amount of the damage. I did not care who was employed to put the goods in order; suggested his own clerks if they were willing to serve. I disclaimed any intention to take possession of the store or the key; he persistently pressed it upon me, and I as persistently declined; was of course interested that the proper direction should be given to this business. As soon as the goods were put in order I wanted the damage ascertained; he immediately claimed for stolen goods; I repudiated any such claim; at Creighton's suggestion, inventory was taken. I denied all legal liability for goods lost, but agreed to pay one-half of the expenses of taking the inventory in order to ascertain the condition of things;

never gave any orders to McNulty about the key, and never had any exclusive possession of it; never made any agreement to settle by the inventory. The books were brought to us, but they did not supply the facts we needed; the invoices seemed to be made from this firm to itself. I knew nothing about the per cent. of profits, nor about the *bonus* on foreign goods; I offered to settle by McNulty's return of damage done, and though I always disclaimed any other legal liability, I was willing and offered to pay $2,500 00 by way of compromise to settle the whole matter; I also offered to submit the entire question of damage and loss to arbitration, as provided in the policy; this the plaintiffs declined.

(Here Creighton's letter of March 13th, 1871, was produced and read.)

"INVERNA, 13th March, 1871.

"Messrs. J. E. JOHNSTON & COMPANY:

"*Dear Sirs:* I am rather surprised to learn to-day that you have declined to make my firm a proposition looking to a settlement of their claim, which Major Mims intimated to me on Saturday would be made. I beg to state distinctly that there can be no arbitration, except in a legal way, in the claim for goods lost and stolen while in your possession; as for the damage sustained by removal, I am satisfied no retail stock of dry goods in Savannah, or, indeed, any other city, could be handled as our stock was and not suffer damage to the extent of twenty-five per cent. at least; but it is now too late to arbitrate on this point, as our stock has been put in order, and a considerable amount of new goods added; aside from this, my former experience is sufficient to prevent me from submitting anything to private arbitration if I can possibly avoid it. I see nothing to prevent this question of damage being settled without troubling outside parties; my partner in Philadelphia and I have decided on the course we will pursue, and it remains for you to say whether we shall be met in the spirit in which it is manifestly the interest of insurance companies to meet their customers, or not. I remain, yours truly,

"JAMES CREIGHTON."

The Liverpool, etc., Insurance Company *vs.* Creighton.

Arbitration was proposed very soon after the inventory was completed; I did not agree to the inventory and appraisement, except for the purpose of procuring information for both parties. The key was in the office on the morning after the fire when I arrived there, brought by Mr. Daniels at the end of his work; but I expressly disclaimed any intention or right to control the key; don't think I ever saw it after that morning. Never acknowledged any legal liability, but offered to pay a sum by way of compromise, and for the sake of peace.

*Cross-examined:* Daniels was in the employ of Joseph E. Johnston & Company. Soon after the inventory was taken, I offered arbitration; Mr. Creighton declined; made the offer verbally, and also in writing; don't remember the precise date of it. When Creighton came there, key was in our office; don't know positively that Creighton used the word abandon, but his proposition amounted to that. My first object was to ascertain what we were bound for—the extent of the damage from removal; denied every other liability, but expressed readiness to arbitrate as to all matters between us under the policy; had several conversations with Creighton, who readily agreed to the steps taken; we acknowledged liability for the removal, and wanted to pay that as soon as it could be ascertained, but always denied liability for losses by theft; the object of the inventory was to obtain data by which to adjust the settlement, but never agreed that McNulty's estimate, or any other estimate, should be conclusive; don't remember with certainty whether the formal proposition to arbitrate was made by letter; it was certainly made orally, and there was correspondence also about it.

2d. W. H. DANIELS, sworn: In 1871, was policy clerk for Johnston & Company; had nothing to do with their business at fires. Remember fire in February, 1871; went to it about eleven o'clock at night; saw it approaching Creighton's store; thought it would reach it, as everybody else then seemed to do; saw Dixon at the store door, who was afraid that fire would reach the store; I thought the goods should be moved,

and Dixon agreed with me; he opened the door and we went in; there was soon a great rush, and a good many others went in; the goods were carried to a distance about twice the width of the court-room and placed on the ground; Mr. Evertsen and one of the express company helped to watch the goods; most of the time Evertsen stood near the pile, and the express man half way between the store and pile; double line was formed from store to pile, goods passing between the two lines; remember that one man broke through the line with goods, and there was a cry and pursuit; believe he was captured, but don't remember precisely; I stood most of the time where I could watch the whole operation; afterwards I changed places with Evertsen; remember to have heard that an order had come to stop the removal; went back and saw Lieutenant Howard, of the police, who told me that removal was stopped; when the excitement had fairly abated, had goods taken back into the store; when the work was done, about daylight in the morning, I locked the door and carried the key away to the office of J. E. Johnston & Company, as there was no one present to whom I could properly deliver it. Not more than one-half of the goods had been moved out of the store; back part of the store had considerable that was not touched at all, in bolts and boxes; I was in position to see goods as they passed from door to pile; did not remain inside, but at the door, which was kept closed; no one was actually put in charge while removal was going on, but Evertsen was near the pile; after goods were all removed, sergeant of police was put in charge; don't remember to have seen Dixon towards the close of the fire; there was no more carelessness in removal than is usual in such cases; don't remember being told that goods were being thrown out of back window.

*Cross-examined:* What I did was intended for the good of the defendant, but I was not directly in the employ of the company; I was only one of the clerks of J. E. Johnston & Company; when I informed them what I had done they told me I had exceeded my powers; I don't remember to have ever seen Mr. Catherwood until to-day; I am the person who

spoke to Dixon in front of the store about removal; removal continued for about three quarters of an hour; quite a number of persons engaged in it; most. of the time I stood outside the door and Dixon inside the store; when the men got ready.to come out with goods, Dixon opened the door and let them out; don't remember to have seen Dixon after removal stopped; before that time I had changed places with Evertsen.

*Re-examined:* From the stoppage of removal to the return of the goods I was there all the time; Evertsen was there too; I watched the door; Lieutenant Howard had ordered every one out of the store; I saw no one come out with goods; don't remember whether the door was kept ·shut or open at that time; don't remember when I got the key first.

3d. ALEXIS McNULTY, sworn: I was employed by Mims to take an inventory of goods and assist in ascertaining the damage. Dixon and I went through the goods, piece by piece, and decided in this way the extent of damage to the whole stock; some goods were not damaged at all, some slightly, some very much; amount of damage thus arrived at was $1,099 14, which was a full and fair allowance—not a gross and lumping result or arbitrary percentage, but the actual damage arrived at by examining each piece; we made a schedule of the goods remaining on hand after the fire.

*Cross-examined:* We returned a statement of this, (which was here produced;) foreign and domestic goods in separate classes; the whole matter was agreed on between Dixon and myself; he and I agreed on the damage to each piece, in every instance, before it was put down on paper; we were paid by Mims to take the inventory; don't think Dixon and I ever failed in any one instance to come to the same conclusion about the damage; I know nothing about missing or stolen goods; every day when the store was closed I took the key to one lock and Dixon the other; neither of us could get in without the other.

4th. KILLOURY, sworn: I was sergeant of police, and present at the fire; from about half-past twelve o'clock to half-past

three o'clock, guarded the goods in the pile taken from Creighton's store; no goods were stolen while I was there; was finally relieved by officer of the day, and a private watchman took my place; when I got there goods were all covered over with a canvass, or something of that sort.

5th. Deposition of EVERT C. EVERTSEN, taken by commission, was here introduced and read: I was present at a large fire which occurred on Bay street, between Whitaker and Barnard streets, Savannah, Georgia, in the month of February, 1871; there was a store in said block of buildings with a sign over the door which bore the firm designation of J. H. & W. Creighton. I saw parties who had the keys of said store, who I believe to be agents of the plaintiffs, and said parties opened the doors of said store and did assist in removing the goods; I assisted in their removal and in guarding them afterwards; at the time of the removal of the goods there were present, among many others, W. C. Cosens, W. W. Carter, his son, John Carter, W. H. Daniel, and two men who I believe to be the agents of the plaintiffs; I lent my assistance at the instance of W. H. Daniel; I remained there long enough to witness, and did witness, the removal of all the goods that were removed; the said goods were turned over to the said W. H. Daniel; I was present when the removal of the goods back into the store was commenced; it was conducted under the supervision of the said W. H. Daniel, myself and some hired men. I was in a position, during the removal of the goods from the store to the street, in which the goods were under my eye from the time they left the door of the store until they were piled up in the street, and I could have easily detected any attempt to steal anything except very small articles which any one might have put in his pocket; I was not present during the whole time that the goods were guarded outside; I was not present when the goods were turned over to the plaintiffs or their agents; I do not know of any goods being lost; there were a good many packages of various kinds broken, owing to the hasty manner in which they

were handled, and which were more or less damaged and their contents more or less soiled; I do not think that the damage done to the goods outside of the store would exceed $500 00. A few moments after the removal of the goods from the store was commenced, I was on the outside of the store near the door, and with the assistance of W. W. Carter, W. C. Cosens and John Carter, and many other persons, formed a line from the doorway to the place where we had commenced to deposit the goods, by stretching a bolt of cotton cloth on either side from the doorway to the pile of goods, distant from forty-five to fifty feet from the door of the store, along which line, men who were engaged in removing the goods passed, and returned to the store; at the pile of goods there were several persons watching them, and among them an expressman, Mr. Arthur Shaaff, and a colored boy who belonged to Joseph E. Johnston & Company's office, named Richard Henry; before all the goods were removed, Lieutenant Howard, came and stopped the removal of the goods, and ordered every one out of the store; then the store was locked up, I believe by the plaintiffs' agents, and a policeman was placed in charge of the goods in the street by Lieutenant Howard; the expressman and one or two of the hired men remained with him, to assist in protecting the goods; about this time, or shortly after, while Mr. Daniel and I were standing by the pile of goods, the agents of the plaintiffs handed the key over to Mr. Daniel, remarking that he had better remove them back into the store, so soon as he was satisfied that the fire was subdued; Mr. Daniel and I were present at the pile of goods nearly all the time they remained in the street, with the exception of a few moments when we went to warm ourselves at the fire, as the weather was very cold, leaving the policeman and the parties already mentioned in charge of the goods; as nearly as I can recollect, the goods remained in the street until about four o'clock in the morning, when Mr. Daniel and I, and the hired men began to put them back into the store, Mr. Daniel standing at the pile, and I in the doorway, and in the store, where I could see the pile

The Liverpool, etc., Insurance Company *vs.* Creighton.

of goods, receiving and directing the storage of the same, as the hired men brought them in on the hand cart; I omitted to state that while the goods were under the charge of the policeman and others aforesaid in the street, Mr. Daniel and I went across the street to procure some whiskey for the men; the removal of the goods back into the store was completed by daybreak, when the store was locked up by Mr. Daniel, and he and I left; there were very few in the street at the time the goods were being carried back into the store; when I went into the store, at the time they commenced to carry the goods back, I noticed a number of broken packages, and some of the goods lying on the floor, which were soiled by having been trodden upon. I was in the employ of defendant as extra clerk in the Savannah office, in July and August, 1870, and for a few days in January or February, 1872; the first time at $4 50 per diem, and the second at $4 00 per diem; I received no pay for my services at the fire.

. 6th. JOSEPH E. JOHNSTON, sworn: I remember the fire; I gave no instructions at all about removal or return of Creighton's goods; did not know that Creighton's store was even in that block. Knowing that there was a partition wall of brick, dividing the western half of the block from the eastern, where the fire was raging, I considered those near the extreme western end in no danger, and advised people generally there not to remove their goods, but assumed no authority whatever in the premises.

*Cross-examined:* I was on the roof of the building nearly two hours; knew nothing personally about Creighton, or that we he had such a policy on goods in that building; I simply called out to people near me not to remove the goods.

PLAINTIFF IN . REBUTTAL.

CATHERWOOD, recalled. Witness reiterates statement about his telling Daniels of robbing in back room; identifies Daniels, and is quite certain that he is the person witness spoke to.

Dixon, recalled. I never before heard of the estimates referred to by McNulty, of the amount of damage; he never consulted me when we were taking the inventory about the damage to different parcels of goods, except casually. I did not know that he was putting down the amount of damage opposite to each piece to be made use of afterwards; I did not in any way become responsible for the correctness of his figures, and was astonished at his statements on that subject on the stand.

James T. Wilson, sworn: I knew about the fire; was one of Creighton's clerks. Mims employed me, with others, to assist in making inventory; I knew of no assessment made by Mc-Nulty and Dixon, jointly, nor of any understanding between them about value.

. The testimony having closed, the court, among other things, charged the jury, that the facts disclosed in the plea of the defendant, founded on those conditions of the policies which provided for an arbitration in case of a difference of opinion as to the amount of loss or damage, did not constitute a defense to the action, and were not to be considered by the jury, and that, although the defendant, through its agents, may have offered to submit the question of the amount of loss or damage sustained to arbitration, in the manner pointed out in the policies, and such offer was refused by the plaintiffs, such refusal did not affect the plaintiffs' right to sue and recover before the amount should be thus ascertained by arbitration. And, further, that if they should find from the testimony that the plaintiffs had sustained damage, they should not include in such damage any amount of loss by theft at or after any fire, such losses being excluded by the conditions and stipulations referred to in the policies.

The jury returned a verdict for the plaintiffs for $5,000 00, whereupon the defendant moved for a new trial upon the following grounds:

1st. Because the court erred in instructing the jury that the facts disclosed in the plea of the defendant, founded on those

conditions of the policies which provided for an arbitration in case of a difference of opinion as to the amount of loss or damage, did not constitute a defense to the action, and were not to be considered by the jury.

2d. Because the court erred in charging that although the defendant, through its agents, may have offered to submit the question of the amount of loss or damage sustained to arbitration, in the manner pointed out in the policies, and such offer was refused by the plaintiffs, such refusal did not affect the plaintiffs' right to sue and recover before the amount should be thus ascertained by arbitration.

3d. Because the verdict of the jury was contrary to the evidence, the law, and the charge.

The motion was overruled, and defendants excepted.

JACKSON, LAWTON & BASINGER, for plaintiffs in error.

RUFUS E. LESTER, for defendants.

TRIPPE, Judge.

1. A stipulation in a policy of insurance providing that in case of difference of opinion as to the amount of loss or damage, there shall be a reference of the same to arbitration, does not bar the insured of his right of action without such reference, unless the stipulation amounts to a condition precedent to his right to resort to the courts, or makes such submission the only mode by which the amount of damage is to be ascertained, or by which the liability of the company can be fixed. Either of these two latter provisions would, at last, be equivalent to making the submission a condition to be performed before suit. In all the cases I have been able to find where the plaintiff was held bound by the stipulation, it was ruled that the terms of the policy were such as to make the reference a condition precedent to the right of the assured to maintain an action. In Scott *vs.* Avery, 5, House of Lord's cases, 811, the stipulation was "the sum to be paid ✳ * * shall, *in the first instance*, be ascertained by the committee."

It was there held that the terms of the policy made the ascertainment of the loss by the committee or by arbitration, a condition precedent to the right of action : See Elliott *vs.* R. E. Assurance Company, 2 Law reports, 237.   The case of Millandon *vs.* Atlantic Insurance Company, 8 Louisiana reports, 557, referred to by counsel for plaintiff in error, does not show, as reported, what were the terms of the stipulation, whether or not they amounted to a condition precedent.   The decision is generally, that " by the ninth condition of insurance, when the claim was made by the plaintiff for loss, if the defendant had offered to refer the question to arbitration, the plaintiff would have been bound to accept."   No reason is given, no authority referred to, and no statement of what the ninth condition was.   Flanders, on Fire Insurance, states the rule thus : "If the loss incurred by the assured is not paid, he may sue for the amount, notwithstanding a stipulation in the policy to refer all disputes to arbitration," page 576.   He adds, on the ensuing page, " If the contract, however, is in such terms that a reference to a third person or to a board of directors, is a condition precedent to the right of the party to maintain an action, then he is not entitled to maintain it until that condition is complied with.   But if, on the other hand, the contract is to pay for the loss, with a subsequent contract to refer the question to arbitration, contained in a distinct clause collateral to the other, then that contract for reference does not oust the jurisdiction of the courts, or deprive the party of his action :"   See May on Insurance, 593, 598, 606, 167 ; Digest of Insurance Decisions, by Littleton & Blatchley, (2d edition, by S. G. Clark,) pages 97 and 99 ; Roper *vs.* Lendon, 1 E & E., Q. B., 825.   Phillips, in his work on Insurance, says, in a note to page 37, " the provisions for arbitration have little or no practical efficacy in marine insurance in Great Britain or the United States.   The assured may bring a suit for a loss without offering a reference," and cites, 2 Story's Equity Jurisprudence, sections 1450, 1457 ; Kidd *vs.* Hollister, 1 Wil. 149 ; 8 T. R., 139 ; Robinson *vs.* Georges, 17 Maine, 131.   I have examined several of these, and find

they support the rule as laid down by Phillips. Baron Alderson said, in a case in 20 Law and Equity, 327, "the contract might have been framed so as to confine the decision of the committee (the referee) solely to the amount of loss, and that at the trial of any action neither party shall inquire into the amount of loss, and that the only question shall be the right to recover." Upon the whole view of the question, both upon principle and authority, we think the rule, as stated from Flanders, is correct, and that such stipulation must clearly show that it is a condition precedent before it can bar the assured of his action. Even then the action of the insurer might be such as to amount to a waiver or estop him from setting it up as a defense.

2. An express condition in the policy, that "the company shall not be answerable for loss or damage by theft at or after any fire," is binding on the insured. This was not controverted in the argument. It was not claimed that the insured was not bound by such a stipulation, or that, under it, the company were liable for loss by theft, but that, in this case, the agent of the insurers took charge of the goods and the house in which they were kept, during the fire and removed the goods, and that they were consequently responsible for the theft of the goods. And the jury must have included in their verdict a large amount for what was stolen; for the highest proven amount claimed for damage to the goods, caused by their removal from the store, was $2,738.40. A much larger amount than that seems, under the evidence, to have been lost by theft. The verdict was for $5,000 00, which certainly was increased to that sum by the testimony as to the stolen goods.

3, 4. We do not think the evidence shows that the store and goods were so taken into the possession and control of the company as to make it liable for the theft which is charged to have been committed. As the case may undergo a new trial, it is unnecessary, and might work prejudice to discuss the testimony on this point. The court charged the jury, that "if they should find that the plaintiffs had sustained

damage, they should not include in such damage any amount of loss by theft at or after any fire, such losses being excluded by the conditions and stipulations referred to in the policy.". The verdict could not have been given for as much as it was, without including at least a portion of the loss caused by theft. It is true that one of the plaintiffs states in his testimony that the damage to the goods saved was about fifty per cent. This would have made the verdict upwards of $5,000; but the witness immediately adds, "though we did not claim that amount." The testimony of Daniels, the clerk and general manager of plaintiffs, and who aided in taking the inventory after the fire, puts the damage to the goods saved at twenty-five per cent.—$2,738 40. One of the parties, who acted with Daniels in making out the inventory, puts the damage still lower. We think the court should have granted a new trial, or required the plaintiffs to have remitted from the verdict a sum which would have reduced it to that amount, to-wit: to the amount of $2,738 40.

5. We accordingly direct that the judgment be reversed and a new trial granted, unless the plaintiffs below will write from the verdict and judgment the sum of $2,261 60; and upon the same being done, the judgment for the remainder shall stand affirmed.