## MENKEN *vs.* THE CITY OF ATLANTA.

1. As long as the owner of liquors retains possession of them, intending to deliver them on an unlawful contract of sale, such possession is within a municipal ordinance which prohibits the keeping of such liquors for unlawful sale.

2. An agent having the actual possession, and participating in the unlawful purpose, is equally guilty with his principal.

3. That the offender will be liable to prosecution under a statute for unlawful selling, when the sale is consummated, will not hinder his being punished under the ordinance for keeping for unlawful sale.

4. The local option legislation of this State being constitutional as a valid exercise of the police power, it follows that the incidental effects upon the value of property, such as a brewery and its fixtures, resulting from the inability of the owners to adjust their old business to the new law, is *damnum absque injuria.* The law does not take or damage their property for the use of the public, but only prevents them from taking or damaging ʃthe public for their use.

5. The express saving of vested rights in the local option act embraces previously acquired rights to sell by virtue of license already taken out and paid for, but comprehends no right, either to obtain new license or to sell without license, whether on the part of natural persons or corporations. The act is not a scheme for stopping the sale of liquors by natural persons, and leaving the business to be carried on by chartered companies.

March 9, 1887.

Criminal Law.    Liquor.    Principal and Agent.    Constitutional Law.    Corporations.    Before Judge Marshall J. Clarke.    Fulton Superior Court.    September Term, 1886.

Reported in the decision.

W. D. Ellis; Hoke & Burton Smith, for plaintiff in error.

J. B. Goodwin; J. T. Pendleton; C. D. Hill, solicitor-general, for defendant.

BLECKLEY, Chief Justice.

The statute of this State, known as the local option law, was passed September 18th, 1885. Session laws, 1884–5, p. 121. It took effect in Fulton county, the county in which the city of Atlanta is located, as the result of a popular election held for that county as the act prescribes. The act declares, under certain penalties, that " it shall not be lawful for any person within the limits of such county to sell or barter for valuable consideration, either directly or indirectly, or give away to induce trade at any place of business, or furnish at other public places any alcoholic, spirituous, malt or intoxicating liquors, or intoxicating bitters, or other drinks which if drank to excess will produce intoxication." The manufacture, sale and use of domestic wines or cider, the sale of wines for sacramental purposes, and the sale or furnishing by licensed druggists of pure alcohol for medical, art, scientific and mechanical purposes, are excepted from the operation of the statute, save that wines or cider shall not be sold by retail in barrooms.

This act being in force, the city of Atlanta, on the 21st of June, 1886, by the mayor and general council, passed an ordinance declaring " that on and after the first day of July, 1886, any person, firm or corporation who shall keep for unlawful sale in any store, house, room, office, cellar, stand, booth, stall, or other place, any spirituous, fermented or malt liquors, shall, on conviction, be punished by fine not exceeding five hundred dollars or imprisonment not exceeding thirty days, either or both, in the discretion of the court." Menken, the plaintiff in error, was tried, convicted and fined for a violation of this ordinance, in September, 1886, upon a charge of keeping for unlawful sale spirituous and malt liquors. He petitioned the judge of the superior court in due form for a writ of *certiorari*, which was denied, and this denial is the error assigned.

At his trial in the municipal court, Menken made affidavit of certain alleged facts, which affidavit the prosecu.

tion conceded to be true. The material contents of. the affidavit were substantially as follows: When arrested, Menken was acting as agent of the Atlanta City Brewing Company, a corporation organized under a charter from the legislature authorizing it to manufacture and sell malt liquors. As such agent he was in possession of bottled beer, which he was delivering at the residences of citizens of Atlanta, for private use of such citizens, in quantities of a quart and more. The beer was the property of the corporation, and he was acting simply as its hired agent. The charter of the corporation was granted long before the passage of the local option law. Under this charter, several years ago, and whilst it was lawful to manufacture and sell malt liquors in the city of Atlanta and elsewhere in Georgia, the corporation invested in its beer manufactory $125,000, to-wit: real estate, $3,100; buildings, $18,000; bottling house and machinery, $7,000; vaults, $50,000; vats and tanks, $15,000; springs, $2,000; general machinery, $20,000; kegs and half barrels, $9,900. This large investment is so specialized and localized that it is available alone at the place where the brewery is situated and for the one special business. Except for the brewing business, the whole property, though costing $125,000, is not worth more than $16,000. A brewing business in Atlanta cannot be conducted so as to compete with establishments of the West without a market for fresh beer in and near the city, and the course of dealing is such that sales, even on orders for shipment by railway, have to be consummated within the city, if made at all. To prohibit delivery of beer in the city will necessarily stop the business of the corporation, and take from it and its stockholders their property to the value of over $100,000.

In addition to what Menken stated in his affidavit, it appeared that he was arrested while in the act of delivering some bottles of beer at the house of one Bliley, in the city of Atlanta, and that he had already sold the same to Bliley· Bliley himself testified that he purchased a number of

bottles of beer from the Atlanta City Brewery, which he ordered delivered at his house, and that afterwards delivery was made accordingly.

1. Though the accused was not the owner of the malt liquors in which he dealt, we may for the present treat him as owner, and consider the question of agency afterwards. It does not appear from his affidavit whether his occupation was only to deliver on past orders, or whether it was partly that and partly to obtain orders and deliver at the time of receiving them. Of course, his affidavit is to be construed most strongly against him as to anything which ought to have been denied, or which naturally would have been denied if not true. The testimony outside of his affidavit shows with reasonable certainty that in one instance he took the order, and made the delivery afterwards. But treat the case in either aspect. If he had possession of these liquors to deliver them in the city on future orders, it would be possession for unlawful sale, and if to deliver on past orders, it would be possession for the consummation of unlawful sale. The title to beer ordered in a city for family use would not pass until actual delivery to the customer, unless delivery were dispensed with by express contract. Certainly it would not pass where the seller undertook to make delivery at the residence of the buyer. Destruction of the article whilst on the way would be the loss of the seller, and any conversion of it, or injury done to it by another, would give the seller a right of action, but none to the buyer. So long as the owner retains possession for the purpose of consummating a sale, past or future, he should be regarded as keeping the article for sale. The property is his, the possession his, and they remain his until delivery is made in pursuance of the contract of sale. Accordingly, we hold that so long as the owner of liquors retains possession of them, intending to deliver them on an unlawful contract of sale, such possession is within a municipal ordinance which prohibits the keeping of such liquors for unlawful sale.

2. That the accused was not the owner, but only the hired agent of the owner, is no excuse for him. The agent's possession is that of the owner; and if the agent participate in the unlawful purpose, he is equally guilty with his principal. In dealing with crime, the law gives no heed to a plea of agency. In criminal transactions, all voluntary agents are accomplices.

3. The position of counsel that the city cannot, with or without an ordinance for the purpose, punish as an offence against the municipality anything which by statute is an offence against the State, is quite sound. But the statute, though it makes the unlawful sale of liquors an offence, does not make the keeping of them for unlawful sale an offence. The ordinance does the latter but not the former. It hovers on the margin of the statute, and nowhere overlaps the text. If there is keeping for unlawful sale, the ordinance is violated, whether any sale is made or not. In case a sale ensues, the statute is also violated; but this does not cancel the violation of the ordinance. An offence committed against one jurisdiction cannot be wiped out by committing another against another jurisdiction. The only object of the ordinance is to prevent preparation for violating the statute. It would be singular if those who prepare, but go no further, could be punished under the ordinance, while those who prepare and then go on to violate could not. So to rule would be like holding that to carry a pistol concealed is an offence only when there is nobody shot. That an offender will be liable to prosecution under the statute for unlawful selling, when a sale is consummated, will not hinder his being punished under the ordinance for keeping for unlawful sale. *Mayson vs. The City of Atlanta.* 77 *Ga.* 662.

4. If it has not been heretofore sufficiently decided, we decide now that the local option legislation of this State is constitutional as a valid exercise of the police power. Historically considered, there is no subject more completely amenable to this power than the sale of intoxicat-

ing liquors. Georgia is upon record as being familiar with the exercise of the power, both before and since the Revolution. Her governing authorities long ago branded distilled spirits as "dangerous" to the public, and even malt liquors have from the dawn of her history been subjected to some degree of police control. Oglethorpe, the founder of the colony, was instrumental in procuring the passage of "an act to prohibit the importation and sale of rum, brandy and other distilled liquors within the limits of Georgia." As early as November, 1733, the common council "resolved that the drinking of rum in Georgia be absolutely prohibited, and that all which shall be brought there be staved." Jones' History, vol. 1, p. 189. Amongst the inducements held out by the trustees, in 1735, to attract emigration to the province was the following: "Negroes and rum are prohibited to be used in the said colony." Id. 195. A curious and minute observer, writing of Savannah, says: "They have some laws and customs peculiar to Georgia; one is that all brandies and distilled liquors are prohibited under severe penalties; another is that no slavery is allowed, nor negroes." Id. 220. It seems that the policy of excluding negroes and rum continued until 1749, and was then abandoned under a strong pressure from the inhabitants. Id. 419–427. These two "contrabands" being admitted into the colony, it soon became necessary to regulate their intercourse with each other, and it was provided by statute that any person selling to a slave, without the consent of his owner or manager, beer or any spirituous liquor was subject to a fine of twenty shillings for the first offence and double that amount for the second. Id. 482. It should be stated that during the period of exclusion, the authorities placed no restriction upon the moderate use of English beer and the wines of Madeira. "With these the trustees' store at Savannah was regularly supplied, and the magistrates there were empowered to grant licenses for retailing beer both of foreign manufacture and of home brewing." Id. 189.

Thus much for the exercise of the police power over the liquor traffic under the early colonial government. I turn now to an act passed by the State in December, 1791, the sixteenth year of independence, found in Watkins' Dig. 453. This act provides that "any person wishing to keep a tavern or house of entertainment shall petition the justices of the inferior court held for the county where such petitioner resides, and the court to whom such petition shall be exhibited shall thereupon consider the convenience of such place intended for a tavern, and having regard to the ability of such petitioner to keep good and sufficient accommodation for travelers, their horses and attendants, may at their discretion grant a license to such person or persons for the term of one year next ensuing the date of such license, and from thence to the next inferior court held for the said county and no longer; which license, upon petition, may be renewed from year to year if the court think proper." The act then goes on to require the recipient of a license to enter into bond with security; to require the justices of the inferior court to establish annually the rates and prices to be paid at taverns for liquors, diet, lodging, provender, stabling and pasturage; and to prescribe a penalty or forfeiture for demanding and receiving prices above the rates so established. It then provides "that if any person shall presume to keep a tippling-house, or retail liquors, or sell by retail any wine, beer, cider, brandy, rum, or other spirits, or any mixture of such liquors, in any house, booth, arbor, stall or other place whatsoever, without license first obtained as aforesaid, he or she so offending and being thereof convicted shall forfeit and pay the sum of ten pounds, one-half to the informer and the other to the use of the county. Provided always, that nothing herein contained shall extend to prohibit any merchant from retailing liquors not less than one quart; nor to prevent any planter or other person from disposing of such brandy, rum or whiskey, as they may make from their own grain, orchards, or distilleries, so that

it be not sold in a less quantity than one quart, nor drank or intended to be drank at the house, store or plantation where the same shall be so sold, except in the counties of Chatham, Liberty and Effingham, wherein it shall not be lawful for any merchant to dispose of any quantity less than one gallon." The fee for each license is fixed at two pounds, to be paid by the applicant. The act concludes with a repealing clause as to all prior acts on the same subject, and adds a proviso saving to the corporations of Savannah and Augusta the sole regulation and power of governing and directing taverns and granting licenses within their several jurisdictions. This act, by its whole tenor and tone, is assertive of plenary power over its subject-matter. It confines to licensed innkeepers the right to sell in quantities less than one quart; it denies to all others, except merchants and producers, the right to sell at all by retail; it denies to producers the right to sell at all for consumption on the premises where sale is made; it discriminates between places in fixing the minimum quantity which merchants are allowed to sell, limiting the quantity to one gallon in three counties, and to one quart in the other counties of the State; and it leaves to the corporate authorities of Savannah and Augusta complete local jurisdiction, so far as sale at taverns in these cities is concerned. Observe also that the mild beverages, wine, cider and beer, are embraced in this act, as well as the more fiery fluids, brandy, rum, whiskey, etc.

The licensed sale of liquors continued to be a branch of the hotel business exclusively until 1809. In that year the legislature provided that an applicant might obtain license to retail liquors without being obliged to keep other public entertainment. Prince's Dig. 840. Whilst various other modifications of the old act of 1791 have been made, yet the legislature of this State has ever held, and still holds, with a firm and steady hand, police control over intoxicating liquors. Several public and numerous local acts on the subject, of more or less importance,

might be cited, but it is unnecessary. Until recently, the tendency has been to tolerate liquors and temporize with their misbehavior, but now there is a disposition to turn most of them once more out of the State. The local option law is the result, and it simply empowers each community to protect itself, not indeed against the presence or consumption of liquors, but against the sale or distribution of them within the given locality. In the nature of things, this cannot be done without affecting unfavorably the business interests of the makers of the proscribed articles, and of those who deal in them.

According to the record before us, the effect upon the Atlanta City Brewing Company has been calamitous in the extreme. Out of an investment of $125,000, the loss of the company has aggregated over four-fifths of that amount, or will do so if the law is upheld and enforced. We treat the record, in this respect, as importing verity for the purposes of a decision of this case. Moreover, we make no question, as corporations can only carry on their business through officers and agents, that the plaintiff in error can avail himself of this loss as a defence, to the same extent (no more and no less) as the corporation might, were it a natural person and under a like penal charge. It is quite certain that the law makes no provision for compensating the corporation for this immense loss or any part of it, and on that account, the constitutionality of the act is denied. The provisions of the constitution of the United States which it is supposed to violate are as follows: "Nor shall any person . . . be deprived of life, liberty or property without due process of law. Nor shall private property be taken for public use without just compensation. Nor shall any State deprive any person of life, liberty or property without due process of law." And those of the State of Georgia (in addition to a provision like the first one above cited) are as follows: "Private property shall not be taken or damaged for public purposes without just and adequate compensation being first paid."

Has the corporation been deprived of its property ? Or has its property been taken ? Or has its property been damaged ? If these questions can all be answered in the negative, the objection fails. Of course, the deprivation, the taking, the damaging, must be in a legal sense, not in a loose, popular sense ; and the inquiry is about the brewery, not the beer. Where there is no deprivation of title, or of possession, or of use (including the *jus disponendi*), it cannot be said with legal propriety that the owner is deprived of his property. Here there is no invasion or abridgment of the title, possession or use of this brewery, or the right to dispose of it. All these stand and remain precisely as they were before the law complained of was enacted. This being so, the question as to deprivation must be answered in the negative. For the same reason, the question as to taking must also be answered in the negative. Taking is only one mode of deprivation. Nothing can be more manifest than that none of the plant or investment of this corporation, real or personal, has been taken.

The remaining question is, whether the property has been damaged within the true intent and meaning of the State constitution ? There has been no physical interference with the brewery, no trespass or tort upon it, no change in its physical surroundings, or in the means of ingress and egress. It is as sound and complete in every respect, and as fit for enjoyment, use and disposition, with this law in force, as it would be without it. No doubt its value is greatly impaired, and impairment of value is often the essence of legal damage. No doubt, too, that the impaired value of this property is a remote consequence of the law, and that were the law repealed the value would be reinstated as it was before. But while to lessen the value of property by changing its physical condition, or by subjecting it directly to new physical conditions of a hurtful character is to damage it, to reduce its value indirectly and incidentally by the casual effects of a

law passed for a wholly different object, is not to damage
it within any legal or constitutional sense of the term.
Rarely, perhaps, does any new law which acts with vigor
upon commerce, local or general, fail to impair the value
of more or less property. Surely the damage clause in
our new constitution was not intended to make the State
or the legislature an insurer against all shrinkage of values
that might result from the passage of laws intended for
the public good. Can it be seriously thought that the
State must literally pay its way to the establishment of a
sound and wholesome system of internal police and public
order?

The local option law rests in no degree upon the power
of eminent domain. It does not contemplate either the
taking or the damaging of anything. It is an exercise of
the police power of this commonwealth, pure and simple.
The incidental effects upon the value of this brewery and
its fixtures result not from any interference with the
property, but solely from the inability of the owners to
adjust their old business to the new law. These effects,
if they can be called damage at all, are *damnum absque
injuria*. The law does not take or damage the property
of these owners for the public use, but only prevents
them, to a certain limited extent, from taking or damag-
ing the public for their use. This is their real grievance,
and for that they have no remedy. Where business and
law conflict, it is the business that must give way, not the
law.

5. A question raised on the construction of a particu-
lar clause of the act remains to be considered. It is the
clause in the fourth section which saves vested rights.
The rights contemplated, we think, are previously ac-
quired rights to sell by virtue of license already taken out
and paid for. The saving comprehends no right either to
obtain new license after the act has gone into effect, or to
sell without license, whether on the part of natural per-
sons or corporations. The act is not a scheme for stop-

ping the sale by natural persons, and leaving the traffic to be carried on by chartered companies. The charter of this company was granted in 1876, and was therefore subject to modification, as declared in the code, §1682.

Judgment affirmed.