NASHVILLE TERMINAL COMPANY v. TENNESSEE CENTRAL
RAILWAY COMPANY.

Middle Section.    January 4, 1926.

Certiorari denied by Supreme Court June 5, 1926.

1. **Contracts.    In a construction of contract court will if possible, ascertain and give effect to the intention of the party.**
   The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles.

2. **Contracts.    Court will not place an unusual construction on words in a contract.**
   Where one construction would make a contract unusual and extraordinary and another construction, equally consistent with the language employed, would make it reasonable, fair and just, the latter construction will prevail.

3. **Contracts.    Acts of parties tending to show their construction of contract will be considered by the court.**
   In an action to recover rent of certain railroad properties where the acts of the parties over a period of several years showed that they valued the property at a certain sum for the purpose of paying rent, and where the language of the contract was susceptible to this meaning, held that the contract should be construed as it had been by the parties.

4. **Contracts.    Contract providing for rental according to outstanding bonds or bonds to be issued, construed to mean only bonds to be issued for the improvement of the property.**
   In an action on a contract to collect rent where the contract provided that the lessor was to pay five per cent on the bonds of the lessee then outstanding or that may thereafter be outstanding, held to mean that the lessor was to pay five per cent only on the bonds that might be issued by the lessee for the purpose of improving the rented property and did not include bonds issued for other investments.

5. **Contracts.    Contract for replacement in case of fire construed.**
   Contract held to be plain and self-explanatory and to fix the duty of restoring and replacing property damaged by fire upon the owner of property.

Appeal from Chancery Court, Davidson County; Hon. James B. Newman, Chancellor.

Affirmed.

Fowler & Fowler, of Knoxville, H. S. Priest, of St. Louis, Mo., and C. Walter Randall, of New York, for appellant.

Walter Stokes, John J. Vertrees and W. O. Vertrees, of Nashville, for appellees.

SENTER, J.    To a proper determination of the questions presented on this appeal and involved in this litigation a review of the transactions between the Tennessee Central Railroad Company,

a Tennessee corporation, and the Nashville Terminal Company, also a Tennessee corporation, becomes necessary.

It appears that the Tennessee Central Railroad Company and the Nashville Terminal Company were promoted and organized in 1893. There was also organized another corporation known as the Brier Hill Collieries, which seems to have been a corporation organized by the same promoters for the purpose of acquiring coal and timber lands along and adjacent to the railroad of the Tennessee Central Railroad Company. It appears that each of these three enterprises were promoted and financed by the Tennessee Construction Company, and it was evidently in the minds of the organizers and promoters that the organization of the collieries company, and the purchase and holding by that company of a large acreage of coal and timber land situated along the line of the railroad would render the railroad properties more valuable, and would afford a considerable source of revenue and traffic to the railroad company, as well as assuring a permanent supply of fuel coal. The railroad was projected and was ultimately built from Harriman, Tennessee, to Hopkinsville, Ky.

The Nashville Terminal Company was organized as a separate corporation under a separate charter, but with the primary view of affording terminal facilities to the railroad company in Nashville. It is apparent from the record that the same group of interests were the promoters of the three enterprises, and that the building of the railroad, and its operation, was the chief aim, and the other two corporations were organized mainly for the purpose of rendering more valuable the railroad; the principal object being, apparently, the enhancement of the value or importance of the railroad.

About May 1, 1902, the Nashville Terminal Company leased all its property and holdings, including all its equipment and facilities in Nashville and the environs of Nashville, to the Tennessee Central Railroad Company for a term of ninety-nine years. The provision of this lease contract of May 1, 1902, important to be noticed at this time, is with reference to the consideration or compensation, constituting the annual rental price, which the railroad company was to pay to the terminal company for the use of the property of the terminal company. This provision is contained in the contract under "Article 7;" and beginning with "Item 1" of said article 7, as follows:

"(1) All fixed charges for State, county, municipal and all other public taxes and charges, whether ad valorem or privilege, imposed upon the properties and franchises of lessor.

"(2) Insurance premiums on all insurance necessary to protect lessor against loss by fire, lightning, storm, or other casualty against

which insurance may be obtained, both upon its own property, real and personal, and upon property of others in its custody, and in which it may have an insurable interest;

"(3) All expenses incurred by lessor for operation, maintenance and repairs; and,

"(4) A six per cent annum return upon the capital actually invested in its properties and facilities.

The said six per cent per annum return upon the capital invested shall be paid semi-annually, on the first days of July and January of each year, beginning with July first, 1902, upon statements or estimates of capital actually invested, made and certified under oath by the Auditor of lessor and filed with lessee and with the Mayor and City Council of Nashville on or before July 1st, 1902, for the year 1902, and thereafter on or before the first day of January of each year for the ensuing year.

"Similar estimates shall be made and filed by the auditor in the same way and at the same time, covering the fixed charges, insurance, and any expenses incurred by lessor for operation, maintenance and repairs as above specified, and same shall be paid by lessee as follows:

"(a) Those accruing in the year 1902, and on the first day of July, 1902, and

"(b) Those accruing in each year thereafter, one-half on January first and one half on July first of such year.

"Or, lessee may at its option, pay such fixed charges, insurance and expenses for operation, maintenance and repairs, as the same severally accrue, upon vouchers audited and certified by the auditor of lessor; and in that event, estimates of such items may or may not be embraced in the annual statements of the auditor above mentioned, as lessee may direct or request. In either event, the accounts between lessor and lessee shall be audited and settled at the end of each year, for such year by committees of lessor and lessee appointed for that purpose, and any and all errors and mistakes in the previous estimates for such year corrected.

"No expenditure for original construction, or for substantial additions to or extensions of the properties or facilities of lessor shall be included in estimates as maintenance or repairs to be paid for by lessee, but all such expenditures shall be treated as capital invested by lessor, and be added to previous investments in the computation of the six per cent per annum return upon actually invested capital; nor shall any expenditures made or to be made by lessor in the restoration, rebuilding or repair of property destroyed or damaged by fire or other casualty insured against, be embraced in such estimates as maintenance or repairs, but all such expenditures shall be made out of and from the proceeds of in-

surance upon the property damaged or destroyed, if any, and otherwise out of and from the funds of lessor, and shall be likewise treated as capital invested by lessor.''

At the time of the execution of the lease contract of May 1, 1902, it appears that the bonded indebtedness of the terminal company was $1,000,000. The railroad company operated under this lease contract from 1902 until 1911. During all of which time the parties construed and interpreted the contract, and acted upon the interpretation of the contract to mean that the railroad company, in addition to the taxes, insurance premiums, operation and maintenance and repairs, would pay 6% per annum, payable semi-annually on the $1,000,000 of outstanding bonds, or $60,000.

On April 1, 1911, a new lease contact was entered into between the Tennessee Central Railway Company and the Nashville Terminal Company, which it is contended, abrogated the lease contract of May 1, 1902, and constitutes the lease contract under which the parties have acted since it went into effect. This second lease contract is also for a period of ninety-nine years. We deem it unnecessary to set out this lease contract in full in this opinion. It appears in the record, volume 1 of the transcript, beginning with page 16 and concluding with page 27. Preceding Article 1 of this second lease contract is a preamble. We here quote the fourth and fifth paragraphs of the preamble.

''WHEREAS, heretofore, on to-wit, the first day of May, 1902, the parties hereto entered into a contract for the use of said properties of the party of the first part for a period of ninety-nine (99) years from said date; and,

''WHEREAS, in the opinion of both parties hereto, said contract is unsatisfactory, unfair to both companies, and, under existing conditions, is unsuitable and inappropriate, and is a serious impediment to providing sufficient funds by the Nashville Terminal Company to properly extend, improve and develop its properties, and said contract is indefinite and that it is impossible from the terms thereof definitely to ascertain and fix the amounts due for compensation thereunder, and the accounts between the parties are therefore in dispute and said contract is otherwise undesirable:''

Then follows the following statement:

''NOW, THEREFORE, pursuant to authority conferred by the directors of the parties hereto in the manner prescribed by law and by their respective by-laws, and in consideration of the mutual covenants, undertakings, stipulations and agreements hereinafter contained, the parties aforesaid hereby cancel and surrender up to each other the aforesaid contract between them dated the first day of May, 1902, and each respectively releases the other from

any and all rights, obligations, claims and demands against each other whether growing out of, connected with or in any way appertaining to said contract, or any other transaction whatsoever to the date of this contract, and hereby, in place of the obligations, covenants and undertakings in said contract contained, and by way of substitution or amendment therefor, covenant, undertake, stipulate and agree to and with each other as follows, to-wit:''

Article 6 of the lease (new lease) fixes the basis of the rental or compensation to be paid by the lessee for the exclusive use or all the terminal properties leased by it. Items 1, 2 and 3 of the second lease are substantially the same as Sections 1, 2 and 3 of Article 7 of the first lease. Items 4 and 5 under Article 6 of the second lease (the lease of 1911) are as follows:

"4. The sum of $10,000 per annum, payable in equal semi-annual installments of $5,000, on the first day of January and July of each year.

"5. A sum equal to the interest at the rate of 5 per cent per annum upon all of the bonds of the parties of the first part now issued or outstanding, or that may hereafter be by it issued and outstanding; payable on the dates as and when the respective coupons on said bonds fall due.

"A certificate of the Trustee, or Trustees, under the mortgage securing the bonds of the parties of the first part stating the number of bonds outstanding, fifteen days prior to the date of maturity of any coupons of said bonds, shall be construed as conclusive evidence of the facts stated in such statement or statements for the purpose of determining the amount of rental to be paid at such time or times.

"If the party of the first part borrows money for corporation purposes otherwise than by the sale of bonds, the party of the second party shall pay as part of the compensation here under interest at the rate of 5 per cent per annum, upon the actual amount of money borrowed for the period of such loan or loans.

"The party of the second part, however, may at its own option pay directly for the account of the party of the first part all such taxes fixed, charges, insurance, expenditures for operation, maintenance and repairs, and coupons on its outstanding bonds as the same severally accure, upon vouchers aduited and certified by the auditor of the party of the first part and the accounts between the party of the first part and the party of the second part shall be audited and settled twice in each year for such half yearly period, on or about the first days of January and July of each year, by committees of the party of the first part and the party of the second part for that purpose and any and all errors and mistakes for the preceding period or periods shall be corrected.''

Two questions are presented by the pleadings in the cause, and for determination by the court on this appeal. ·

The first question raised, is what amount of annual rental the Tennessee Central Railway Company is required to pay to the Nashville Terminal Company for the use of the terminal properties contained and set forth in the lease contract.

The other queston presented is with reference to replacements of property destroyed by fire and only partially covered by insurance, and whether the difference in the cost of rebuilding and replacing the destroyed property should be borne by the railway company or by the terminal company, after the application of the insurance collected.

We will first consider the question of the amount of annual rental to be paid by the railway company to the terminal company under the provisions of the lease contract.

At the time of the first lease contract entered into between the parties, of May 1, 1902, the capital stock of the terminal company issued and outstanding, was $1,000,000, and there was at that time outstanding $1,000,000 of the first mortgage bonds of the Nashville Terminal Company. The lease contract of May 1, 1902, under Item 4 of article 7 provided for "6 per cent per annum" return upon the capital actually invested in its properties and facilities." Under this item provision is made for arriving at the amount of capital actually invested upon statements or estimates made and certified under oath by the auditor of the lessor. It appears that during all the time that the Tennessee Central Railroad Company and the Nashville Terminal Company operated under this contract of May 1, 1902, that the capital actually invested, and upon which the 6 per cent would apply was the $1,000,000, and all settlements of rental was made on that basis, or $60,000 per annum, and also all fixed charges for State, county, municipal, and all other public taxes and charges, ad valorem or privilege, imposed upon the properties and franchises of the lessor; and also all insurance premiums on all insurance necessary to protect lessor against loss by fire, etc.; and also all expenses incurred by lessor for operation, maintenance, and repairs.

At a special meeting of the stockholders of the Nashville Terminal Company held in Nashville on June 9, 1909, the following resolution, and preamble thereto, was adopted, as appears from the minute book of the stockholders and directors of the Nashville Terminal Company, filed as Exhibit "b" to the answer and cross-bill in the cause.

"WHEREAS, the property of this company is subject to a certain mortgage dated January 1, 1902, made by this company

to the Mercantile Trust Company, of St. Louis, as Trustee; and,

"WHEREAS, it is expedient for this company, and this company desires, to provide funds for refunding and taking up its indebtedness, for making additional to its property and extensions thereof, for the purchase of additional property, and for such other corporate purposes to borrow money;

"RESOLVED, that this company for the purposes aforesaid issue its bonds to be limited to an aggregate principal amount of Three Million Dollars ($3,000,000) at any one time outstanding, to be known as its forty-year five per cent (5%) refunding gold bonds, to mature on the first day of May, 1949, to bear interest from May 1, 1909, at five per cent (5%) per annum, payable semi-annually on the 1st day of May and the 1st day of November in each year; to be payable both as to principal and interest at the office of the New York Trust Company, in the city of New York, in gold coin of the United States of equal to the present standard of weight and fineness, without any deduction for any tax or taxes which this company may be required to pay thereon, or to retain therefrom, under any present or future law or ordinance of the United States of America or of any state, county, or municipality therein, and to be redeemable at the option of the company at a premium of five per cent (5%) and accrued interest on any half-yearly interest day on sixty (60) days notice.

"RESOLVED, that said bonds to be in the form of coupon bonds to be of the denomination of One Thousand Dollars ($1,000).

"RESOLVED, that said bonds be in such form and contain such provisions as the Board of Directors may in its discretion determine.

"RESOLVED, that said bonds be reserved and issued under the mortgage and deed of trust securing said bonds for such purposes, in such amounts, in such manner and under restrictions and conditions as may be determined by the Board of Directors and set out in said mortgage and deed of trust.

"RESOLVED, that to secure said bonds for whatever purposes and whenever issued this company execute and deliver to such trustee, or trustees, as may be selected for that purpose by the Board of Directors, a mortgage and deed of trust on and of the terminal, railroads and interest in railroads, equipment, franchises, and property owned by this company, now or at the date of the execution and delivery of said mortgage and deed of trust, or which thereafter may be acquired

by this company, as the Board of Directors shall determine and as shall be set out in said mortgage and deed of trust.

"RESOLVED, that said mortgage and deed of trust be in such form and contain such provisions as the Board of Directors may in its discretion determine."

The Chairman then submitted to the meeting a form of first refunding mortgage and deed of trust, to be made by the Company to the New York Trust Company, to secure the proposed refunding bonds provided for in the above resolution, and in which form there is set out a form of the proposed refunding bonds to be issued in conformity to the resolution.

This form of mortgage containing the form of the bonds is fully set out on the Minute Book, beginning on page 9 and ending on page 51, and by vote of the stockholders was adopted, and by a resolution adopted at said meeting directed the Directors of the company, in the name of and in behalf of the company, to cause to be executed a mortgage and deed of trust substantially in the form proposed, and to cause the execution and the issuance of the refunding bonds as provided in the resolution with reference to the same hereinbefore quoted. The minute book of the corporation further shows that on June 9, 1909, the Board of Directors of the company met in Nashville at a special meeting, on the same date and immediately following the Stockholders meeting. The Stockholders present at the Stockholders meeting were, Eben Richards, Union Bank & Trust Company, by G. W. Ristine, its proxy H. C. Pierce, George W. Ristine, C. E. Norton, and W. D. Witherspoon, representing the entire capital stock of the corporation. At the Directors meeting all members of the Board of Directors were present, as follows: H. C. Pierce, Geo. W. Ristine, Eben Richards, W. D. Witherspoon, and C. E. Norton. At that Directors meeting the following proceedings appear from the Minute Book on pages 56 and 57:

"The following proceedings were had:

"On motion duly seconded, it was

"VOTED: that the officers of this company are hereby authorized and directed to purchase $495,000 face value out of a total issue of $500,000 face value of first mortgage 6 per cent gold bonds of the Brier Hill Collieries at a price not to exceed $275,000, and in order to raise funds to make such purchase the proper officers are hereby authorized and directed to borrow on behalf of this company, the sum of $275,000 or so much thereof as may be necessary to pay for the said bonds and to evidence said loan by the collateral note of this company in usual form for such time and rate of interest as may be agreed on and to pledge as collateral security therefor the bonds of

the Brier Hill Collieries so purchased and also $1,000,000 face value of the first refunding mortgage bonds of this company, dated May 1, 1909.

"The Secretary read the resolution passed at a meeting of the Stockholders held today, authorizing the execution and delivery of refunding mortgage of New York Trust Company securing issue of $3,000,000 forty years five per cent (5%) refunding gold bonds, and on motion, duly seconded, it was

"RESOLVED: that this Board of Directors endorse the action of the Stockholders in that respect and the officers of this company are authorized and directed to execute and deliver said mortgage and to execute and deliver the bonds authorized and secured by said mortgage and to do 'all things whatsoever which may be necessary and proper to carry into effect the said mortgage according to its terms.

"The following resolution was then offered:

"WHEREAS, by resolution of the Board of Directors this day passed it was resolved that the officers are authorized to borrow on behalf of this company $275,000 and pledge as a part of the security therefor $1,000,000 forty year 5 per cent first refunding mortgage gold bonds of this company;

"NOW, THEREFORE, be it resolved, that the New York Trust Company, Trustee of the mortgage securing said bonds be and it is hereby directed to certify and deliver to the proper officers of this company for the purposes stated in said mortgage, $1,000,000 first mortgage forty year 5 per cent gold bonds in accordance with section 2 of article 2 of the mortgage dated May 1, 1909, between this company and the New York Trust Company, Trustee, and further that a copy of this resolution, duly authorized, be furnished to said trustee, as evidence of the action duly taken.

"Thereupon, Mr. W. D. Witherspoon asked that the meeting be informed as to the intent and purpose of such purchase, to which Mr. Pierce made the following statement in explanation, to the effect:

"That the several properties namely, the railroad company, Brier Hill Collieries and Nashville Terminal Company were practically controlled by himself and associates, and it was desirable to retain the ownership of these properties; that while the securities in question were held by outsiders, in order to prevent the sale of their bonds to persons who were not interested in any of the associated properties, it was considered advisable that this property consisting of thousands of acres of valuable coal lands now reached by the tracts of the Tennessee Central Railroad Company and which in a manner by

purchase of these bonds will insure to the railroad company an unlimited supply of coal for its engines as well as for commercial purposes, should not be permitted to pass into the Control of persons who may not have any interest in the property; that the purchase of the bonds was only a temporary expediency and under the decision of Judge Priest and General Counsel Fordyce, there was nothing in the charter of the terminal company which would prevent their purchase as a temporary expediency as a protection to the property from passing into the control of an interest through foreclosure proceedings that in a measure would be detrimental to the associated interests and which would decrease the traffic of the railroad as well as to cut off its independent coal supplies. That immediate action was necessary as something was likely to be done next week and that arrangements had already been made by Judge Priest to borrow money on the collateral as stated, and thereby prevent a sale of the bonds to outside parties.

"Whereupon, Mr. Witherspoon stated that if the financial plans embodied in the resolution was simply a temporary expediency as explained by Mr. Peirce for the purpose of protecting the coal company, he saw no legal objection in that view of the resolution, to its adoption.

"And thereupon, on motion duly seconded, the resolution was unanimously adopted. . . ."

It further appears that in pursuance of the above resolution the terminal company through its officers proceeded to buy the $495,-000 of the bonds of the Brier Hill Collieries company, and to make this purchase obtained the funds by executing a demand note payable to W. L. Wagner, the Secretary of Mr. H. C. Pierce for the amount of $273,387.16, the amount necessary to make the purchase of these bonds. This demand note payable to W. L. Wagner was dated July 11, 1909, two days after the meeting of the Board of Directors above referred to. This note was properly endorsed in blank by W. L. Wagner and delivered to H. C. Pierce. The transaction contemplated that the terminal company would place with Mr. Pierce the $495,000 of the bonds of the Collieries Company purchased by it, and also the $1,000,000 of the refunding bonds authorized by the resolution of June 9, 1909. These bonds were later directed to be issued and delivered by the Trustee, under the trust deed to Mr. Eben Richards, who was the then President of the terminal company, he having succeeded H. C. Pierce as Chairman of the Board of Directors, and these bonds presumably were turned over by Mr. Richards to Mr. Pierce as collateral to the collateral note of ($273,387.16).

In 1917 Mr. Pierce proceeded to reduce these collaterals by having same sold under the collateral agreement and at which sale he became the purchaser of the $495,000 of the Brier Hill Collieries Bonds and the $1,000,000 refunding bonds, at the price of $100,000.

It is now contended for the Nashville Terminal Company that under the lease contract of 1911 the terminal company is entitled to receive from the Tennessee Central Railway Company, under Item 5 of article 6 of the lease contract of 1911, an amount equal to 5 per cent on the original $1,000,000 of the bonds of the terminal company, and also on the $1,000,000 of bonds alleged to have been issued by the terminal company under the resolution of June 9, 1909, and hypothecated as collateral security to the $273,387.16 obtained from Mr. Pierce and used in the purchase by the terminal company of the $495,000 of the Brier Hill Collieries Company bonds.

For the Tennessee Central Railway Company it is contended that under a proper construction of the contract of April 1, 1911, and Item 5 of article 6 thereof, the terminal company is only entitled to receive 5 per cent on all bonds of the terminal company then outstanding, or that may be issued and outstanding, where the proceeds are used by the terminal company for the improvements and betterments of the terminal company's properties; that the $1,000,000 refunding bonds were not used for any legitimate corporate purposes, and not used for improvements, extensions, and betterments of the property leased by the railway company from the terminal company.

The respective contentions of the parties must be determined by a proper construction of the contract.

The primary rule in the construction of contracts is that the court must, if possible, ascertain and give effect to the mutual intention of the parties, so far as that may be done without contravention of legal principles. 13 C. J., sec. 482, p. 523.

In McKay v. R. R., 138 Tenn., 595, it is said: "In the construction of contracts the object is to ascertain the intention of the parties, and the important question is what the contract means as a whole." To the same effect is Arbuckle v. Kirkpatrick, 98 Tenn., 221.

Courts will look to the nature of the subject-matter, the relation of the parties to the contract, and the object sought to be accomplished. 2 Paige on Contracts, sec. 1123; McKay v. R. R., supra.

An excellent statement of the rule, especially with reference to the surrounding circumstances, facts, situation of the parties, etc., is given in 6 R. C. L., sec. 239, p. 849:

> "Courts, in the construction of contracts, look to the language employed, the subject-matter and the surrounding circumstances. They are never shut out from the same light

which the parties enjoyed when the contract was executed, and accordingly they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the thing described. It is therefore an established canon of construction that in order to arrive at the intention of the parties the contract itself must be read in the light of the circumstances under which it was entered into. General or indefinite terms employed in the contract may be thus explained or restricted as to their meaning and application. And the contract must be so construed as to give it such effect, and none other, as the parties intended at the time it was made.''

Another statement of the rule is to the effect that where one construction would make a contract unusual and extraordinary and another construction, equally consistent with the language employed, would make it reasonable, fair and just, the latter construction will prevail. Stoddard v. Golden, (Calif.), 178 Pac., 707; 3 A.L.R.. 1060.

Another universal rule of construction is that the interpretation given by the parties to the contract should receive great weight, if not controlling, by the courts when called upon to construe any provision of the contract under which the parties are acting, or had acted. On this subject a very fair statement of the rule is given by 2 Williston on Contracts, sec. 223, as follows:

"The interpretation given by the parties themselves to the contract as shown by their acts will be adopted, and to this end not only the acts but the declaration of the parties may be considered. But if the meaning of the contract is plain, the acts of the parties can not prove a construction contrary to the plain meaning.''

The above rule is quoted and approved in Canton Cotton Mills v. Overall Company, 149 Tenn., 29; see also Chicago v. Sheldon, 9 Wall., 50, 19 L. Ed., 594; Yowell v. Life Insurance Company, 141 Tenn., 70.

It is clear from the record that the Tennessee Central Railroad Company continued to operate and to use the Nashville Terminal Company's properties after June 9, 1909, up to the date of the second lease contract made in 1911 under the provisions of the first contract of May 1, 1902, or about two years after the additional million dollars of bonds of the terminal company had been issued under the authority of the resolution passed by both Stockholders and Directors of the terminal company on June 9, 1909. Item 4 of the lease contract dated May 1, 1902, provided for the payment

"of 6 per cent per annum return upon the capital actually invested in its properties and facilities." This amount to be paid on the first day of July and January of each year, beginning with July 1, 1902, upon the statements or estimates of capital actually invested and made and certified under oath by the auditor of the lessor and filed with the lessee.

Settlements of the annual rental were made by the lessee paying to the lessor on the basis of. one million dollars actually invested capital at the rate of 6 per cent per annum, or $30,000 semi-annually until the new contract of April 1911.

It is clear that the parties considered that the $1,000,000 original bonds of the terminal company represented "the actual amount of capital invested." This was two years after the issuance of the $1,000,000 additional bonds by the terminal company, and hypothecated together with the $495,000 of the Brier Hill Collieries Company bonds to secure the note of $273,387.16. Neither party to the contract up to that time seemed to consider that the additional $1,000,000 of bonds represented capital actually invested in the terminal company's properties.

The foreclosure suit was brought by the Mercantile Trust Company, as Trustee, in the United States District Court at Nashville, to foreclose the deed of trust or second mortgage executed by the railroad company in 1909. That suit was filed on December 31, 1912, and receivers were appointed by the court in that case in January, 1913, and the receivers operated the railroad under orders of the court in that cause from January, 1913, until the final sale of the property under the orders of the court in that case in January, 1922. During all the time that the receivers were operating the railroad they were using the Nashville Terminal Company's properties under the lease contract of 1911.

It is clear from the record that all the parties construed the annual money rental to be paid by the receivers of the railroad company to the terminal company on the basis of $10,000 a year, plus an amount equal to 5% on $1,000,000 of outstanding bonds of the terminal company, amounting in all to $60,000 annual money rental. These payments were made on vouchers made up and audited.

It is also clear from certain correspondence passing between officers of the terminal company and the receivers of the railroad company and in so far as the money rental was concerned, it was recognized that the proper basis was an amount equal to 5 per cent of $1,000,000, plus the $10,000 or a total of $60,000.

In the letter appearing at pages 120, 121 and 122 of the Minute Book of the terminal company and dated December 6, 1913, written by Eben Richards, president of the Nashville Terminal Company to the Receivers of the Tennessee Central Railroad Company,

Items 3 and 4 seem to confirm the interpretation given by the parties to the contract, and are as follows:

"3. Nashville Terminal Company acknowledged that it has heretofore received on the 1st day of July, 1913, in the form of payment direct to the Mercantile Trust Company, St. Louis, Trustee, $25,000 on account of rental to July 1, 1913, leaving a balance due of $5,000 up to that date, which should be paid with interest from July 1, 1913, to date of payment.

"4. On or before December 31, 1913, there will be due under said contract of lease an additional sum of $30,000 as rental to that date."

In the same letter under Item 8 there appears the following:

"8. Paragraph 5 of article 6 of the lease of April 1, 1911, provided that the railroad company shall pay as one item of rental 'a sum equal to interest at the rate of 5 per cent per annum upon all the bonds of the parties of the first part now issued or outstanding, or that may hereafter be by it issued and outstanding.' The first refunding mortgage of the Nashville Terminal Company dated May 1, 1909, provides among other things that additional refunding bonds may be issued by it up to $1,000,000 at the rate of not less than 90 per cent of the face value thereof for additional costs of the betterments or improvements to the property of the terminal company. Therefore, it is proper and the terminal company contemplates the issuance of bonds as provided in the mortgage to reimburse the terminal company for the costs of such betterments and improvements including the $4,022.47 which we are willing the railroad company should charge against the terminal company in the rental adjustment as above outlined as well as any other items of a similar nature made since April 1, 1911."

It will thus be seen that in this letter Mr. Eben Richards, President of the Nashville Terminal Company, made no reference whatever to the $1,000,000 of bonds issued by the terminal company and delivered to Mr. Pierce as collateral security for the loan of $273,387.16 used in the purchase of the $495,000 of bonds of the Brier Hill Collieries Company, and did not treat this $1,000,000 of outstanding bonds as having been in contemplation of the parties to be considered in arriving at the amount of annual rental to be paid by the railroad company to the terminal company under the lease contract of April 1, 1911.

The record further discloses that from the date of the execution of the second lease contract in April, 1911, until about April 1, 1920, the terminal company did not make any insistence or claim that the railroad was due to pay rental in excess of the 5 per cent on

capital actually invested in the terminal company, and at no time from 1911 until April, 1920, did the terminal company make any demand or claim. that the $1,000,000 of bonds issued and delivered to H. C. Pierce as collateral security for the loan should be included in the basis of arriving at the amount of rental to be paid annually by the railroad company to the terminal company. So far as the record discloses the first intimation that a claim of this kind would be made is contained in a letter addressed to Messrs. W. K. McAlister and H. W.. Stanley, Receivers, Tennessee Central Railroad Company, by Eben Richards, President of the Nashville Terminal Company, dated April 1, 1920, pages 136 to 138, inclusive of the transcript. In that letter Mr. Richards states: ''Mr. H. C. Pierce, as the owner of all of the $1,000,000 face amount of refunding Ibonds has recently called upon this company for interest of said bonds, at the same time stating that he had not prior to January 1, 1919, demanded interest on his said refunding bonds, but deferred such demand for the reason that the railroad company and its receivers were unable to pay such rental and maintain the property in operation, but he now demands payment in full for such interest.''

And further in the same letter Mr. Richards states: ''The terminal company accordingly calls upon the Tennessee Central Railroad Company and its receivers for $50,000 additional rental per annum (being 5 per cent per annum on said $1,000,000 of refunding bonds) from May 1, 1909.''

It is then suggested by Mr. Richards in the same letter that ''pending the adjustment of this question, it is suggested that the receivers now send in addition to the check of $60,000 at least interest for one year on the refunding bonds, $50,000.''

This letter from the President of the terminal company announcing that the terminal company would expect the additional rent at the rate of $50,000 per annum from the receivers from 1909 to the date of the letter was promptly replied to by the receivers by letter dated April 8, 1920. This letter appears in the transcript at pages 238 and 239, and is as follows:

''We beg to acknowledge receipt of your letter of April 1st and to express great·surprise at its contents. The receivers of the Tennessee Central Railroad Company are for the first time officially advised of the issuance by the Nashville Terminal Company of $1,000,000 of first refunding .5 per cent, 40 year gold bonds, dated May 1, 1909, and your claim for additional rental on the terminal properties of $50,000 per annum, with 5 per cent interest on these additional refunding bonds.

''Nearly eleven years have elapsed since these bonds were issued and no claim has heretofore been made for any addition-

al rental upon this basis. These bonds according to your statement were issued May 1, 1909, nearly two years before your lease for the terminal properties to the Tennessee Central Railroad Company, which was dated April 1, 1911. No mention of these additional bonds was made in the lease, but from the date of that lease up to the present time, both parties have understood and construed the lease as fixing the basis of rental at 5 per cent on $1,000,000 of bonds, plus $10,000 to cover cost of maintenance, etc. While we have no record of this additional issue of bonds, we are informed that they were issued for the benefit of the Brier Hill Collieries, or for the purchase of bonds or stocks of a coal company to be owned and operated by the Nashville Terminal Company, in violation of law. There is no pretense that these bonds were issued for additional, betterments and improvements of the terminal properties, as contemplated by your refunding mortgage of May 1, 1909.

"We cannot entertain for one moment your claim for additional rental based on these additional refunding bonds, and shall vigorously oppose any action looking to the enforcement of such a claim.

"It is true the Receivers in enclosing draft for $60,000 to cover rental for the year ending December 31, 1919, did not include interest on these deferred payments. In view of the fact that the terminal properties had been taken over by the government and all operating revenues of the Tennessee Central Railroad Company appropriated, the Receivers hoped that you would not demand interest on these deferred payments since you well know that the default was due entirely to the action of the Government. However, since you insist upon the collection of this interest, we are enclosing voucher for $1,760 to cover it.

"With the payment of this interest, our entire indebtedness to the Nashville Terminal Company, including the year 1919, is discharged."

It is clear from the above letter that the receivers were greatly surprised at the claim or demand being made for this additional rent. So far as the record discloses, the terminal company made no further demand until the filing of the petition on September 22, 1921, by the terminal company in the receivership case then pending in the United States District Court.

While it is stated in the petition of September 22, 1921, that interest on this additional $1,000,000 had been continually claimed, and was then claimed, yet we fail to find anywhere in the record that any claim had been made by the terminal company upon the

railroad company, or upon the receivers of the railroad company, of this additional rental until the letter of April 1, 1920, written by Mr. Richards to the Receivers.

This was but one of the questions presented in the petition filed by the terminal company referred to, and the questions presented by the petition and the answers of the receivers thereto were referred to Hon. John DeWitt, as special master, to take proof and report on the respective issues and matter presented by the petition and answers. Mr. DeWitt, as special master reported adversely to the contention of the terminal company on that particular item, the terminal company excepted to the findings of the special master on several of the items contained in and covered by his report, but it is significant that the terminal company did not except to the findings of the special master on the particular item with reference to the amount of rental that the railroad company was to pay the terminal company under item 5 of article 6 of the lease contract of 1911.

The report of the Master on this subject was duly confirmed by the court, and no exceptions taken or appeal prayed from the decree of the court by the terminal company, and the matter seems to have rested there until after the sale of the property under the orders of the United States District Court, when it was bid off by Mr. Hover, whose bid was transferred to the Tennessee Central Railway Company; and not until the bill was filed in this cause.

It is also clear from the record that the $1,000,000 of so called refunding bonds now held by Mr. Pierce, and issued under the alleged authority of the resolution passed by the terminal company on June 9, 1909, were not used for the purpose of making any improvements of any kind or character to the terminal properties leased to the railroad company. This $1,000,000 of bonds was used solely for the purpose of enabling the terminal company to purchase the $495,000 of bonds of the Brier Hill Collieries Company, and when issued were hypothecated as collateral security to the note for $273,387.16, executed by the terminal company and made payable to Wagner, and by Wagner endorsed in blank to Pierce.

Item 5 of article 6 of the second lease contract of April 1, 1911, provided for the payment by the railroad company to the terminal company of "a sum equal to the interest at the rate of 5 per cent per annum upon all of the bonds of the parties of the first part now issued or outstanding, or that may hereafter be by it issued or outstanding; payable on the dates and as when the respective coupons on said bonds fall due." It also provides in the second paragraph under Item 5 as follows: "Certificates of the Trustee, or Trustees, under the mortgage securing the bonds of the parties of the first part stating the number of the bonds outstanding, 15

days prior to the date of maturity of any coupons of said bonds, shall be construed as conclusive evidence of the facts stated in such statement or statements for the purpose of determining the amount of rental to be paid at such time, or times.''

We fail to find anywhere in the record that the Trustee, or Trustees, under the mortgage securing the bonds referred to ever rendered any statement or statements to the railroad company that included the interest on the $1,000,000 of bonds involved in the instant controversy.

Certainly the parties to this contract did not intend that the railroad company was obligating itself to pay a money rental in an amount equal to 5 per cent of the bonds of the terminal company then outstanding, or that may hereafter be outstanding, regardless of whether bonds subsequently issued would be used to improve and extend the terminal facilities, or whether to be used, as this $1,000,000 of bonds were used, in the purchase of $495,000 of bonds of another corporation, which, in no sense, would have operated to improve the terminal facilities which the terminal company was leasing to the railroad company. As above stated the parties themselves never placed any such interpretation upon this contract.

Of course, if the meaning of the contract is plain and free from ambiguity, the acts of the parties can not prove a construction contrary to the plain meaning. ''Where one construction would make a contract ''unusual and extraordinary and another construction equally consistent with the language employed would make it reasonable, fair and just, the latter construction must prevail.''

Applying the rules of construction as hereinbefore set out in this opinion, and under the authorities cited, can it be said that the railroad company would intentionally enter into a contract with the terminal company to pay as money rental for the use of the terminal properties an amount equal to 5 per cent on all bonds now issued or that may hereafter be issued, regardless of whether bonds to be hereafter issued were legally and lawfully issued and intended for corporate purposes, or whether when issued they would be used for purposes other than corporate purposes? We think such a construction would make the contract both ''unusual and extraordinary.''

On the other hand, to construe the language of the contract to mean, that the railroad company would pay the money rental on a basis of 5 per cent of all bonds outstanding, or that may be hereafter issued and outstanding, when issued and outstanding, for corporate purposes, in the sense that the proceeds would be used in improving and extending the facilities of the terminal company to better serve the railroad company, or in other words to be

expended for betterments to the plant, would be the fair, reasonable, just and ordinary intention of the parties.

Under the well-settled rule that the intention of the parties to a contract may be ascertained from the interpretation that both parties give to the contract, makes it clear, we think, that the intention of the parties under the present contract was that the railroad company should pay an annual rental of 5 per cent on the bonds of the terminal company outstanding or to be afterwards issued and become outstanding, where the proceeds of the bonds are used for the improvement or extension of the terminal facilities or the general betterment of the terminal plant. That this interpretation was given to the contract by all the parties, at least until about April 1, 1920, cannot be denied under the facts as disclosed by this record.

It results that this court concurs in the findings of fact by the learned Chancellor, and in his proper application of the law to the facts, under the well-settled rules of construction as set forth in this opinion, on the subject of the amount of annual rentals to be paid by the railway company under the contract.

The second, and only other question left to be disposed of involved in the suit, and made the basis of an assignment of error, is with reference to the replacement of the property damaged and destroyed by fire, and at whose expense the replacements should be made after the application of the insurance collected?

Article IV of the lease contract of 1911 contains the only provision with reference to insurance and replacements and is as follows:

"The party of the first part for itself, its successors and assigns, hereby further covenants with the party of the second part, its successors, assigns, and sub-lessees that the party of the first part will cause all its terminal buildings, improvements and appliances to be fully insured against loss or damage by fire, and will keep the same so insured during the term of this contract and the party of the first part reserves the right to be exercised by it at its discretion from time to time to insure the said terminal buildings, improvements and appliances against lose or damage by lightning, storm, flood or other casualty against which it may be able to obtain insurance; and a full and complete account of all such insurance will be kept by the party of the first part subject to inspection by the party of the second part from time to time upon its deman. In case of loss or damage to any of the buildings, improvements or appliances covered by said insurance, the party of the first part will, with reasonable despatch, cause the buildings, improve-

ments or appliances so destroyed or damaged to be restored or repaired and put in sound condition, applying thereto all of the proceeds derived from said insurance policies, unless the consent in writing of the party of the second part not to so apply all or any part of said insurance shall be first obtained. Nothing, however, herein contained shall be construed as relieving the party of the first part of the duty to replace said injured or destroyed property, should the same have been inadequately insured or not insured at all.''

We do not see how there could be any considerable controversy under the provisions of the contract on this subject as above quoted. It seems clear to us that Article IV. of the lease contract is self-explanatory and clearly fixes the duty of restoring the damaged or destroyed property on the party of the first part (the terminal company). ''In case of loss or damage to any of the buildings, improvements, or appliances covered by said insurance, the party of the first part will, with reasonable despatch, cause the buildings, improvements or appliances so destroyed or damaged to be restored or repaired, and put in sound condition, applying thereto all of the proceeds derived from said insurance policies.'' And the further provision: ''Nothing, however, herein contained, shall be construed as relieving the party of the first part of the duty to replace said injured or destroyed property, should the same have been inadquately insured or not insured at all.''

After the fire occured resulting in the damage and loss of certain of the buildings, machinery, and equipment covered by the lease, the railway company made proper request and demand upon the terminal company to make the necessary and proper replacements of the damaged and destroyed property, relying upon the provisions of the contract above quoted. The terminal company declined to comply with this request or demand, whereupon, the railway company proceeded to make the replacements of the damaged and destroyed property and to restore the same. It appears that after applying the insurance collected, of $41,837.35, the net balance for the costs of the improvements as proper credits paid by the railway company was $93,111.60.

We concur in the conclusion reached by the Chancellor that this expense should be borne by the Terminal Company under the provisions of the contract.

Again applying the rule of construction to be used by the courts in construing contracts as hereinbefore referred to and set out, to the above quoted article IV of the contract, we think it clear that the Chancellor was correct in holding that the obligation to make these replacements was upon the terminal company.

It results that all assignments of error are overruled and the decree of the Chancellor is affirmed. The costs of this appeal to be paid by appellant, and sureties on the appeal bond.

Faw, P. J., and Crownover, J., concur.