## LAWRENCE v. WHITE.

1. Where a landlord leased to a tenant for a term of five years a hotel described as consisting of "the corridor, office, bar, barber-shop, cigar-stand, billiard-room, on the first floor, boiler-house and kitchen fronting on Ellis street, the second, third, fourth, and fifth stories of the hotel proper, the open court on the second floor, the open courts fronting on Ellis street," and provided that the tenant might sublet the news-stand, cigar-stand, barber-shop, billiard-room, and barroom, and, if he should do so, such part of the premises subleased, and especially the bar and billiard rooms, should be kept free from disorder and maintained in an orderly and reputable manner; and where after the commencement of such lease the legislature passed an act prohibiting the sale of alcoholic, spirituous, malt, or intoxicating liquors, and thus the barroom could no longer be used for the purpose of conducting such business, in the absence of any provision in the contract of lease for that purpose the tenant was not entitled to a reduction or proportional abatement of the agreed rental.

2. A mere general stipulation in a contract of lease that in case of difference between the parties it shall be referred to arbitration does not prevent either party from resorting to the courts without such reference.

Argued July 25, 1908.--Decided February 11, 1909.

Petition for injunction. Before Judge Hammond. Richmond superior court. July 2, 1908.

James B. White leased to Bryan Lawrence a hotel in the city of Augusta known as "The Albion Hotel" for the term of five years, to begin on the opening of the hotel for the reception of guests not later than April 20th, 1901, with privilege of renewal. The stipulated rent was $10,000 per annum, payable in monthly instalments of $833.33. The only portions of the written contract of lease which need be set out are as follows: "The leased premises consist of the corridor, office, bar, barber-shop, cigar-stand, billiard-room, on the first floor; boiler-house and kitchen fronting on Ellis street; the second, third, fourth, and fifth stories of the hotel proper; the open court on the second floor; the open courts fronting on Ellis street, to which the tenants occupying stores fronting on Broad street are entitled to use in common with the tenant herein named. . . The said Bryan Lawrence, tenant, subject to the provisions hereinafter stated, may sublet the news-stand, cigar-stand, barber-shop, billiard-room, and barroom; provided, that all such subletting shall be with the distinct contract and agreement on the part of the subtenants that the premises, or

parts of the premises, sublet to them shall be conducted, kept, and maintained in a quiet, peaceable, orderly, and reputable manner. The tenant herein especially agreeing that the bar and billiard rooms shall be kept free from disorder and all objectionable features, and maintained in a quiet, peaceable, orderly, and reputable manner; and that if there is any violation of this agreement, the said subtenant or subtenants, failing to carry out the agreements herein, shall at once be evicted by said Bryan Lawrence, or, upon his failure so to do, that the lease of the premises described herein may immediately, or at any time thereafter at the option of the lessor, be declared at an end, and the lessor entitled to re-enter and take possession of the entire premises. Provided, also, and it is distinctly understood and shall be a part of the agreement with every subtenant, that if for any reason this lease is forfeited, abandoned, or terminated, that the rights of said subtenant or subtenants, to the part of the premises sublet to him or them, shall at once cease and become void, and such subtenant or subtenants may be evicted. . . If at any time there shall be any disagreement between the parties as to the rights and duties of the parties, or either of them, or as to the meaning or construction of these presents, or if any dispute, difference, or issue shall arise between the parties touching the effect of these presents, or of any clause or thing herein contained, then every such dispute or matter in dispute shall be referred to the arbitration of two persons, of kin to neither of the parties, one arbitrator to be appointed by each party. . . And both the parties hereto agree to stand to, abide by, and perform any award rendered under the provisions of this lease, and this paragraph. . . It is distinctly agreed by the tenant, that, as a material and essential part of this contract, the said Albion Hotel and the premises hereby leased shall be used, occupied, and operated for hotel purposes alone, and that the said Albion Hotel, in furniture, appointment, fare, and service, and in every other respect, shall be conducted and maintained as a first-class hotel, and that the same shall be conducted and maintained in a businesslike, orderly, and reputable manner, and substantially like other first-class hotels in the South. . . But nothing herein shall deprive, or be construed to deprive, the lessor of the right to resort to the courts for the enforcement of any rights hereunder, nor shall this contract be construed to deprive

the lessor of any statutory or common-law remedy for the collection of rents or damages for breach of the covenants herein stipulated." It was also provided that if the premises should be wholly destroyed by fire before the expiration of the lease, the liability to pay rent should cease; and in case of damage by fire rendering the premises temporarily untenantable, repairs were to be made, and no rent required while this was being done. The lease was renewed, after the first term, for five years more. On August 6, 1907, an act passed by the legislature was approved, prohibiting the manufacture or sale of alcoholic, spirituous, malt, or intoxicating liquors in the State after the expiration of that year. After this act became operative the lessee claimed that he was entitled to an apportionment and reduction of the rent, because of his inability to further conduct the business of a bar in the hotel. A correspondence ensued between him and his landlord on the subject. He sent to the landlord the key of the bar, writing him that "As I have been prohibited from using this part of the property for that purpose, by the law of the land, and as I rented it for that purpose, I have no use for it for any other purpose." The landlord returned the key to the barroom, declining to make an abatement in the rent on account of the effect of the prohibition law, and demanded the payment of rent at the monthly rate stated in the lease. In one of his letters the lessee demanded an arbitration. The lessor declined to allow any abatement in the rent, and sued out a distress warrant for past-due rent at the monthly rate stipulated, and also a dispossessory warrant, for the purpose of evicting the lessee from the premises on account of the failure and refusal to pay the rent without abatement. The lessee thereupon filed an equitable petition, claiming an abatement of the rent to be made in proportion to the diminution in rental value because of the legal impossibility of operating a barroom on the premises; and praying that the lessor be enjoined from prosecuting the actions at law commenced by him, and for process and general relief. It is unnecessary to set out the evidence, further than to state that the lessee testified, that the agent of the lessor, in negotiating with him in regard to the lease before it was first made, had informed him that parties had endeavored to rent the bar for $5,000, and that if the witness would lease the bar and hotel he (the agent) would give him the names of the parties who had offered to rent

it, so that the lessee could realize from the bar that amount, and that he could take that into consideration in making an agreement as to the amount of rental he was to pay; that the witness stated to the agent that, by reason of the location of the bar within the hotel, it was absolutely necessary that the witness should control the conduct and management of it, if he should lease the hotel property; that the value of the bar was urged as a reason for increasing an offer made by him for the rental; and that it induced him to make the offer of $10,000 for the bar and other parts of the hotel property as subsequently set out in the lease. In the correspondence between the parties, the attorneys for the lessor denied the statement which, had been made in a letter of the lessee that the bar was largely the inducement which controlled him in making the lease at the price named, and stated that the lessor insisted that the hotel was leased as a whole, and that he was in no respect responsible or liable for the effects of State prohibition on the property leased by it. On the hearing of the application for interlocutory injunction it was denied, and Lawrence excepted.

*C. Henry & Rodney S. Cohen, William K. Miller,* and *Austin Branch,* for plaintiff. *Lamar & Callaway,* for defendant.

LUMPKIN, J. 1. The question in this case is whether the lessee of a hotel, including a barroom, was entitled to a reduction or proportional abatement of the agreed rental, because during the term of the lease the legislature of the State enacted a law prohibiting the sale of alcoholic, spirituous, malt, or intoxicating liquors, and thus the bar could no longer be used for that purpose. The adjudicated cases with unusual uniformity answer this question in the negative, though they do not all give the same reasons for the ruling. It has been very generally held that the enforcement by public officers of restrictions or conditions in regard to the use of leased premises does not amount to an eviction of the tenant. And it has been suggested that a basic principle on which these rulings may rest is, that, to constitute a constructive eviction by the landlord, the act complained of must have been done by the landlord or by his procurement, with the intention and effect (or perhaps with the natural effect) of depriving the lessee of the use and enjoyment of the demised premises, in whole or in part. Taylor *v.* Finnigan, 189 Mass. 568 (76 N. E. 203, 2 L. R. A. (N. S.) 973, and note).

In Abadie *v.* Berges, 41 La. Ann. 281 (6 So. 529), it was said that "A landlord can not be held to warranty and indemnity against the 'acts of the law,' in the absence of express stipulation to that end. Should a tenant sustain damage in consequence of a constitutional police legislation adopted subsequently to his contract of lease, such as the 'Sunday law,' which forbids the use of the property rented, to a particular use to which the lessee applies it, in a special way and on a special day, such damage is injuria sine damno, which is not compensable. Such legislation could have been foreseen, and does not impair rights under the contract." In San Antonio Brewing Association *v.* Brents, 39 Tex. Civ. App. 443 (88 S. W. 368), it was held that "A lease which recites that the building was let for the purpose of conducting a first-class saloon, 'and shall not be used for any disreputable purpose,' and providing that the premises should not 'be sublet for any purpose other than for conducting a saloon, without the consent of the landlord in writing,' did not limit the use by the lessee to saloon purposes nor release him from liability for rent after the adoption of prohibition of that business under the local option law." In Teller *v.* Boyle, 132 Penn. St. 56 (18 Atl. 1069), it was held that "The lessee under a lease containing a covenant that, under penalty of forfeiture, he would neither occupy nor permit the premises to be occupied otherwise than as a saloon or dwelling, without the lessor's written consent indorsed, is not released from liability for the rent by a failure to obtain a license to sell liquors." In Baughman *v.* Portman (Ky. App.), 14 S. W. 342, a contract of rental for a one-half interest in a hotel which had a barroom attached to it, was made for a term of years. In the opinion it was stated that "A barroom was attached to the hotel, and, no doubt, was one of the principal sources of revenue to the proprietor. The local option law, passed by the legislature after the making of this contract, deprived the appellee of this source of profit, and reduced the proceeds from the hotel greatly. Baughman, who owned the hotel in conjunction with Portman, was an ardent advocate of the law, and it is urged that this act of his so far affected the contract as to authorize its rescission. Without discussing this question, we need only say that, if a renting, the lessee took it subject to legislative regulation; and it was no violation of the terms or the spirit of the contract for Baughman to

vote either for or against the sale of liquor." In Houston Ice and Brewing Co. *v.* Keenan, 99 Tex. 79 (88 S. W. 197), premises were leased for three years "for the saloon business." Afterward prohibition was adopted in the county by an election held under the local option law. The tenant contended that the stipulation in the lease that the premises should be used for the saloon business constituted an express covenant that said premises should be used for no other purpose, and that, inasmuch as such use became illegal by the adoption of prohibition in the county by an election, this absolved him from liability for the rent. Under the stipulation in the lease then being considered, that the premises should be used for saloon purposes, the court was of the opinion that the tenant covenanted to use them for no other purpose. But, in spite of this, it was held that "the fact that such business was rendered unlawful by the result of the election did not relieve him from his obligation to pay the rent," and it was added, "the law being in existence when the lease was made, he should have provided in the contract against the contingency of its being put in force in the county, if he wished relief from his obligation in that event." In Miller *v.* McGuire, 18 R. I. 770 (30 Atl. 966), it was held that "The inability of a lessee to obtain a renewal of his license for the sale of intoxicating liquors on the leased premises, because the power of the license commissioners to grant a license had been taken away by the erection of a public school by the City of Providence within four hundred feet of the premises, is not an eviction. To constitute an eviction which will operate either to annul a lease or to suspend the rent, some act must have been done by the landlord or by his procurement, with the intention and effect of depriving the lessee of the use and enjoyment of the demised premises in whole or in part." In Kerley *v.* Mayer, 31 N. Y. Supp. 818 (Common Pleas), a lease was made of certain premises "to be used and occupied only as a strictly first-class liquor saloon." After the execution of the lease, but before the commencement of the term, the legislature enacted a law forbidding the sale of liquor within two hundred feet of a church or schoolhouse. It was held that this did not release the lessee, as he was not deprived of the beneficial use of the premises. The court thought that the provision that the premises should be used only as a "strictly first-class liquor saloon" did not restrict the

use of the premises to saloon business only, but merely restricted the character of that business conducted there, so that it should be first-class. In the opinion of Daly, C. J., it was said: "It is only when the lessee is deprived, without his fault, of the use of the premises for any purpose that rent ceases; and if the lessee were deprived in this instance, it was his own fault, for he should have stipulated against the contingency of a refusal of a license."

In the English case of Newby *v.* Sharpe, L. R. 8 Ch. Div. 39, a landlord let the basement of a store to a tenant "with full and undisputed right and liberty to store cartridges therein," covenanted to keep the premises in proper repair and condition, so as to be available for storing cartridges, and also covenanted for quiet enjoyment. Other parts of the store were at that time let to other persons for storing gunpowder. Soon afterward what was known as the explosives act of 1875 was passed, making it illegal to store cartridges and gunpowder in the same building. The landlord, upon the act coming into operation, removed the tenant's cartridges out of the building. A correspondence ensued, and the landlord stated to the tenant that the basement was at the disposal of the latter, but that if he stored cartridges there the landlord must, to protect himself from liability, give notice to the authorities. The tenant thereupon commenced his action to restrain the landlord from obstructing the storing of his cartridges, and to compel him to do everything necessary to enable the plaintiff to store them there, and for damages. Fry, J., held that the tenant was entitled to damages for the loss of the use of the demised premises, on the ground that the landlord's acts amounted to an eviction. On appeal it was held that judgment must be entered for the defendant, for that, (1) there had been no eviction, the removal of the plaintiff's cartridges being only a trespass; and (2) there had been no breach of covenant by the defendant, for that the covenant to keep the premises in proper condition for storing cartridges only referred to their physical condition; and that the grant of liberty to store cartridges there did not import a warranty of the legality of so storing them, nor did anything in the lease bind the landlord to procure licenses to make the storage legal. In Nicholls *v.* Byrne, 11 La. (O. S.) 170, (N. S. 110), the plaintiffs alleged, that they leased a lot of ground in the city of New Orleans, fronting on the Mississippi river, for the purpose of breaking up flat-

boats and cutting and selling firewood and lumber; that soon after they took possession they were notified by the wharfinger to cease using the premises for that purpose, in pursuance of a city ordinance passed after the date of the lease, which expressly prohibited the demolishing of flatboats, rafts, etc., within the limits of the city; and that in consequence of such order they were dispossessed of their lease, and were entitled to a cancellation of it, together with damages. The court held that "Lessees have no right to complain of the city ordinances which restrict them in some of the uses of the leased property, provided such ordinances are legal; and if illegal, the lessee can protect himself. It does not invalidate his lease by dispossession, or otherwise disturb him in the enjoyment of the leased premises. . . The restriction of the privileges in using leased property, by city ordinances, affords no justification in withholding rent." See also Chase v. Turner, 10 La. (O. S.) 19, (N. S. 390). In Gazlay v. Williams, 210 U. S. 41, it was held that a sale by a trustee in bankruptcy of the bankrupt's interest was not forbidden by, nor was it a breach of, a covenant for re-entry in case of assignment by the lessee or sale of his interest under execution or other legal process, where there was no covenant against transfer by operation of law; thus distinguishing between the act of the law and the act of the party. See also McLarren v. Spalding, 2 Cal. 510; International Trust Co. v. Schumann, 158 Mass. 287 (33 N. E. 509); Baker v. Johnson, 42 N. Y. 126; Kellogg v. Lowe, 38 Wash. 293 (70 L. R. A. 510); 24 Cyc. 1133; 18 Am. & Eng. Encyc. Law (2d ed.) 627, 628.

The exact question here involved has not been determined in this State; but the analogies of the law point in the direction indicated above. Thus the Civil Code, §3135, declares that "The destruction of a tenement by fire, or the loss of possession by any casualty, not caused by the landlord, or from defect of his title, shall not abate the rent contracted to be paid." In *Fleming & Bowles* v. *King,* 100 *Ga.* 449 (28 S. E. 239), it was held that the tenant of a rented house is liable for the stipulated rent to the end of his term, although the house, before the expiration of such term, may be destroyed by fire, unless the landlord does acts which in law amount to an eviction of the tenant; and that "erecting an inclosure around the rented premises and pulling down the walls of the burned building, these things being done by the landlord under

orders of the municipal authorities, for the purpose of insuring safety to the public, are not such acts." While the word "casualty," as used in section 3135 of the code, does not include an effect arising from legislative action, the hardship is no greater in the latter case than in those covered by that section. In either case the tenant may protect himself by proper agreements in the lease. In *City of Fitzgerald* v. *Witchard*, 130 *Ga.* 552 (61 S. E. 227), the municipal authorities received the prescribed fee and issued licenses authorizing certain persons to engage in the sale of intoxicating liquors for the remainder of the year. Before the expiration of the year the General Assembly enacted a law requiring a much higher license fee for the right to sell liquors in the county where the city was located. The licensee thereupon ceased to engage in the sale of liquors, and applied to the municipal authorities for a return of so much of the money paid for their licenses as would be in proportion to the time in which they did not engage in such business. After the year covered by the license had expired, the mayor and council then in office granted the application, and resolved to refund the proportionate part of the money. Citizens and taxpayers filed an equitable petition to enjoin them from doing so. This court held that such a petition was not open to general demurrer. In delivering the opinion, Mr. Justice Atkinson said, that, if it be assumed that the licensees quit business because of the act of the legislature, "the agency which prevented the licensees from enjoying the privileges was the State law, separate and distinct from the municipal government."

It is urged that the facts in cases of the character cited above differ from those in the present case. This is true to some extent, but not so as to prevent the applicability of the principle involved in them to the case in hand. The mere fact that, when the tenant rented the property, it was thought that he could continue to sell liquor there would not entitle him to a proportionate abatement of the rent because the legislature subsequently prohibited the sale of liquor in the State. If it would do so, why should not licensed druggists insist that they have been prevented from doing the business of filling prescriptions for liquors, or for alcohol except under close restrictions? No doubt this was known to them and their landlords to be a profitable part of their business, which has been cut off by the act of the legislature; but it would hardly be con-

tended that every druggist who occupies a rented store could claim a reduction in the rental on that ground. Similarly many grocers, who formerly sold wines and liquors, were prevented from doing so further by the act of the legislature; but it could not be said that, if when they leased their stores it was anticipated that they would continue such sale, they would be entitled to an abatement in the rent because of the legislative prohibition.

It was urged that the lease now involved specifically named the bar, and that its operation was a material consideration entering into the lease of the hotel. In the illustrations just given it could no doubt be frequently proved that both landlord and tenant knew that the latter was selling wines, alcohol, or liquors, and that this was a material part of the business. The mere use of the word "bar" in the lease did not amount to a covenant or warranty on the part of the landlord that the law would continue to allow the tenant to conduct the business of keeping a bar and selling liquors, or a covenant by the tenant that he would do so. The property rented was known as "The Albion Hotel." In describing it the following language was used: "The leased premises consist of the corridor, office, bar, barber-shop, cigar-stand, billiard-room, on the first floor; boiler-house and kitchen fronting on Ellis street; the second, third, fourth, and fifth stories of the hotel proper; the open court on the second floor; the open courts fronting on Ellis street, to which the tenants occupying stores fronting on Broad street are entitled to use in common with the tenant herein named." From the last clause quoted, as well as from a statement appearing in the correspondence between the parties in regard to the controversy, it would seem that the entire building was not rented to the lessee, but that there were some tenants of stores on the first floor not included in the hotel proper. The language quoted was merely descriptive of what was rented, not a covenant on the part of the tenant to conduct the business of keeping a barroom, or a warranty on the part of the landlord that the law would permit him to continue to do so. Nor did other portions of the lease have that effect. It would be no more proper to hold that the employment of the words "bar" and "barroom" amounted to a covenant to use the place thus designated for the sale of wines, beer, or liquors, and for no other purpose, than it would be to declare that the words "billiard-room," "barber-shop," and "kitchen" im-

54

ported a covenant on the part of the tenant to use the rooms so described for billiard and pool playing, barbering, and cooking, respectively, and for no other purpose; or that the place designated as the "office" should be put to no other use by the tenant than to keep an office there. And the provision in regard to keeping good order does not make a covenant of exclusive use for the business of selling liquors.

It was argued that as to the bar the tenancy was terminated; and cases were cited to the effect that where an apartment in a building is rented, and the building is destroyed, the tenancy ceases. *Gavan* v. *Norcross*, 117 *Ga.* 356, 360 (43 S. E. 771). Also, to sustain the contention that if there is a substantial destruction of the subject-matter of the lease, by the act of God or the public enemy, rent ceases (9 Cyc. 631); that eviction by the landlord results in suspension of rent; eviction by another from a portion of the premises, under paramount title, entitles the lessee to an apportionment of rent (24 Cyc. 1186-7); that, according to some authorities, if part of the premises are taken by condemnation, under the power of eminent domain, the rent may be apportioned; and that to the general rule that a party to a contract is not discharged by subsequent impossibility of performance there is an exception where the performance becomes impossible by law (9 Cyc. 629-631; Civil Code, §3725). These propositions, as abstract rules, do not require discussion. They do not aid the plaintiff in error, because they do not apply to the facts of this case. Neither the leased premises nor any part of them have been destroyed; no act of Providence or of the public enemy has affected the status. The only act complained of is that of the Georgia legislature. There has been no eviction of the tenant from the premises by the landlord or by one holding paramount title, and no condemnation of any part of them. Nor has the law prevented the carrying out of the written contract between these parties. An underlying error in the contention of the plaintiff in error arises from dealing with the contract of lease as different from what it really was. The landlord leased to the tenant a certain hotel, including a barroom, cigar-stand, etc. The tenant contracted to pay certain rent; that the premises should be used for hotel purposes alone; and that it should be a first-class hotel; with other agreements not material now to recite. The argument for the plaintiff in error treats the

lease, so far as relates to the barroom, as a lease of the "bar privilege" or right to sell liquor. Such is not the effect of the written lease. The landlord leased the premises to the lessee. So far as he was concerned as landlord, under the law as it then stood, he gave the lessee the privilege of using a portion of them for a bar, or of subrenting. But he did not contract or warrant that the law would remain unchanged, or that there should be any diminution of rent, if a change occurred. It may be unfortunate for the lessee that he did not anticipate the possibility of the passage of a prohibition law and provide for such a contingency; but that he did not do so does not alter the contract as made. The lessee is still entitled to the occupancy and use of the premises. The landlord (who had nothing to do with making the sale of liquor by the lessee impossible under the law) is entitled to his rent. The law has not made it impossible to perform the contract of rental of premises. That must not be confused with the prohibition by law of selling liquor on the rented premises. See, on incidental injury from police laws, *Menken* v. *City of Atlanta*, 78 *Ga.* 668 (2 S. E. 559); State *v.* Griffin, 69 N. H. 1 (41 L. R. A. 177, 39 Atl. 260, 76 Am. St. R. 139).

It might be remarked that prior to the passage of the prohibition act there existed in Georgia a local option law, and all persons were bound to know that there was a possibility that the sale of liquors might be prohibited in any county, under an election held for the determination of that question. Also the sale of liquors has for a great many years been the subject of legislation, regulating, restricting, or prohibiting the business in different localities; and this must have been known to all men. But the argument of notice from special facts is unnecessary. The sovereign State in its police power may pass laws restricting or prohibiting the sale of liquors. Landlords and tenants who make contracts of leases of premises are bound to know that the State has such a power; and in the absence of any provision in a lease for an abatement of the rent in case of the exercise of it, or similar provision, the landlord will not be held to warrant against the possible action of the State in that regard, and the tenant who leases the premises will not be entitled to an abatement of rent because the State prohibits the sale of liquors.

Long before the passage of the prohibition law a person desiring

to conduct the business of selling intoxicating liquors had to obtain a license. The licensing authorities had certain powers in regard to granting or refusing it. Suppose that a landlord had rented a room to a tenant who expected to keep a bar there, the landlord agreeing to let him have the room and the tenant agreeing to pay a stipulated rental therefor; but suppose, upon application, the tenant failed to obtain a license and could not conduct a bar on the premises, would it be contended that the landlord could not collect his rent? If the landlord delivered the rented premises to the tenant, and did not obstruct their lawful use by the tenant, the latter could not claim an abatement of rent because of his own inability to obtain a license. The landlord did not guarantee that the tenant could obtain a license, unless it was so expressed in the contract. The loss from inability to conduct a certain business would fall on the tenant desiring to do so, not on the landlord, who had nothing to do with causing such loss. So likewise, if, after commencing the business of keeping a bar, the license of the tenant should be revoked, in the absence of an agreement on the subject he would not be entitled to a diminution of the rent. And this would be true whether the revocation of the license by the authorities was on the ground of misconduct of the tenant, or, in the lawful exercise of the police power, on other grounds. Similarly, if the legislature substantially terminates all licenses, or prohibits the issuance of future licenses, or the conduct of such business, by the passage of a general prohibition law, the inability to procure a license or to conduct the business of selling liquors without it furnishes no reason in law for refusing to pay the agreed rent for the premises, on the theory of an eviction, a breach of covenant, or a failure of consideration. If it was desired to provide against contingencies or possibilities of this character, such provision should have been made a part of the contract. Mere anticipation or expectation that the tenant will be able to procure a license, or to keep it, or that the State will not restrict or profit business of the character which he expects to conduct, does not, upon disappointment, cast the loss upon the landlord, unless it be so provided in the contract. The tenant can still use the premises for other purposes not prohibited by law or the contract.

It was argued by counsel for the defendant in error, that the

contract was entire, not severable; that the tenant retained possession of all the rest of the premises, and only offered to surrender the barroom; and that this could not be done so as to claim an apportionment of the rent. As the case is controlled by what has been said already, it is unnecessary to deal with this contention. The doctrine of equitable mistake was also invoked by the plaintiff in error; but the case made was not such as to render it applicable.

2. The contract contained a provision that if at any time there should be any disagreement between the parties as to their rights and duties or those of either of them, or as to the meaning or construction of the contract, or if any dispute, difference, or issue should arise between them touching the effect of the contract or of any clause contained in it, "then every such dispute or matter in dispute shall be referred to the arbitration of two persons akin to neither of the parties, one arbitrator to be appointed by each party." The tenant requested an arbitration of the matter of apportioning the rent; and the landlord, instead of agreeing thereto, brought suit. The argument was that this was in violation of the stipulation quoted. In regard to this contention two points may be suggested: (1) The contract contains the following, "But nothing herein shall deprive, or be construed to deprive, the lessor of the right to resort to the courts for the enforcement of any rights hereunder, nor shall this contract be construed to deprive the lessor of any statutory or common-law remedy for the collection of rents or damages for the breach of the covenant herein stipulated." (2) The stipulation in a contract providing that in case of difference between the parties it shall be referred to arbitration does not prevent either party from resorting to the courts in the first instance, without such reference, unless such stipulation amounts to a condition precedent to the right to sue, or (what is substantially the same thing) makes such submission the only mode by which the amount of damage may be ascertained, or by which liability can be fixed. Whether an agreement having the effect of ousting the courts of jurisdiction might be against public policy is not now involved. *Leonard* v. *House,* 15 *Ga.* 473; *Liverpool, London and Globe Ins. Co.* v. *Creighton,* 51 *Ga.* 95; *Adams* v. *Haigler,* 123 *Ga.* 659 (51 S. E. 638) ; 2 Am. & Eng. Enc. Law (2d ed.), 570-573.     *Judgment affirmed. All the Justices concur.*