Mary **KELLER**, Plaintiff–Appellee,

v.

**WEST–MORR INVESTORS, LTD.,**
Defendant–Appellant,

**and**

**Rite–Aid of Tennessee, Inc., Third Party Defendant–Appellee.**

Court of Appeals of Tennessee, Eastern Section.

Dec. 7, 1988.

Permission to Appeal Denied by Supreme Court April 3, 1989.

William H. Skelton, Wanda G. Sorbieski, and Edward A. Cox, Jr., with Baker, Worthington, Crossley, Stansberry & Woolf, Knoxville, for appellant West–Morr Investors, Ltd.

John F. Dugger, with Bacon, Dugger, Jessee & Perkins, Morristown, for appellee Mary Keller.

David A. Lufkin, with Finkelstein, Kern, Steinberg & Cunningham, Knoxville, for appellee Rite–Aid.

## OPINION

SANDERS, Presiding Judge (Eastern Section).

Plaintiff–Appellee, Mary Keller, was awarded a judgment for lost profits resulting from alleged fraudulent or neglectful representation by the Defendant, which induced her to enter into a lease contract. The Defendant–Appellant, West–Morr Investors, Ltd., has appealed, presenting the issues before us for consideration.

The Defendant, West–Morr Investors, Ltd., (hereinafter West–Morr) is the owner of a shopping center in West Hamblen County. The shopping center was developed by its predecessor in title, PBM Developers (hereinafter PBM) in 1980. Mr. Don Matthews was the leasing agent for PBM and is also the leasing agent for West–Morr. As pertinent here, in 1981 PBM, through its leasing agent, Dan Matthews, leased a space in the shopping center to the Defendant–Appellee, Rite–Aid of Tennessee, Inc. (hereinafter Rite–Aid) for the purpose of operating a full-line drugstore. He also leased a number of other spaces to other business establishments including Winn–Dixie Super Market.

In August, 1985, there was a vacancy in the shopping center which was leased by Don Matthews as the leasing agent for West–Morr to the Plaintiff–Appellee, Mary Keller, for a movie and VCR tape rental house. The Plaintiff moved into the premises and engaged in the business of renting movie tapes and VCR machines. Soon after the Plaintiff began operations she learned Winn–Dixie was renting tapes. Upon becoming aware of this she contacted Mr. Matthews and solicited his assistance to get Winn–Dixie to discontinue renting tapes. It was her position that she had the exclusive right to rent tapes in the shopping center. In due time Winn–Dixie discontinued renting tapes. However, in April, 1986, the Defendant–Appellee, Rite–Aid, began renting tapes in the shopping center. Again the Plaintiff called upon Mr. Matthews to have Rite–Aid stop renting tapes, but Rite–Aid refused to do so and that precipitated this litigation.

In her complaint the Plaintiff alleged that West–Morr, through its agent, Don Matthews, as an inducement to lease the property, represented to her she would have the only store or business in the shopping center selling, leasing or renting VCR recorders and tapes. She insisted the leasing of tapes by Rite–Aid was a violation of her lease agreement and relied upon the following paragraph of her lease:

*Restrictions Upon Further Leasing:* During the term of this Lease and any extended term thereof, neither the Lessor nor any persons or entity driving [sic] title to any property through Lessor or having an ownership interest in the Shopping Center shall rent, lease or give occupancy of any other property now or hereafter owned or controlled by or leased to them for use as a movie and VCR rental

house within a two thousand foot radius of the Shopping Center.

Upon an amendment to her complaint she alleged Don Matthews, as agent of West-Morr, falsely and fraudulently and with intent to deceive her, represented to her that if she leased the space she would be the only store or business in the shopping center selling, leasing or renting VCR recorders and tapes.

The Plaintiff asked for injunctive relief restricting Rite-Aid from leasing or renting VCR machines or tapes in the shopping center during the term of her lease. She also asked for damages against both of the Defendants.

For answer, Defendant West-Morr denied it had made any false misrepresentations to the Plaintiff. It also denied the Plaintiff was entitled to any affirmative relief against it.

Before the case was set for trial Rite-Aid closed its store in the shopping center and the suit as to it was dismissed. However, West-Morr then filed a third-party complaint against Rite-Aid asking it have a judgment over against Rite-Aid for any amount the Plaintiff might recover against it.

Upon the trial of the case the chancellor found the issues in favor of the Plaintiff and awarded her damages against West-Morr in the amount of $25,287. He also found Rite-Aid had not violated the covenant in the Plaintiff's lease by renting tapes and dismissed West-Morr's third-party action against Rite-Aid.

West-Morr has appealed, presenting the following issues for review:

I. Whether the alleged oral representations of a leasing agent to a prospective tenant that no other tenant in the shopping center would be renting videotapes, gives rise to a cause of action for negligent misrepresentation where a prior tenant's lease agreement allowed such tenant to use space in the shopping center for the sale of items commonly sold in a full-line drug store?

II. Whether an award of damages was proper when the records of the claimant do not permit reliance thereon and the award is based on the alleged lost gross profits of the claimant?

III. Whether a lease agreement, drafted by the lessee, allowing the lessee "to use the Premises for the sale of health and beauty aids and/or for the sale of any or all items commonly sold in full-line drug stores" allows such lessee the right to rent videotapes?

While we find ourselves in agreement with the chancellor in his determination of the case as it relates to issues I and III, we cannot agree with the chancellor on his award of damages. The chancellor filed an excellent memorandum opinion. Since we concur for the most part in the conclusions reached by the chancellor and find the evidence in the record supports these conclusions, we incorporate a pertinent part of the memorandum opinion as follows:

"Plaintiff premises her suit against defendant on two theories: breach of covenant in her lease contract with defendant and misrepresentations that induced her to enter into that lease contract. It appears that plaintiff cannot prevail upon her first theory. Paragraph 23 of her lease reads as follows: [Here the chancellor repeated the paragraph in Plaintiff's lease which is quoted on page 3 of this opinion.]

"The context of this paragraph reveals that it is prospective in application only. Its title or heading indicates that there are certain restrictions on *further* leasing. The language of the paragraph itself indicates that the Lessor shall not rent to any other person any of the premises which is to be used as tape rental establishment. There is no way that this paragraph can be read as an express covenant that none of the existing tenants have the authority to rent videotapes. Inasmuch as the offending tenant, Rite-Aid, had a lease that predated plaintiff's, there was no breach of the right of exclusivity granted in Paragraph 23 of plaintiff's lease since it was prospective in effect. However, the Court finds that the plaintiff, during negotiations with the leasing agent, specifically asked him if any other tenants then rented, or could in the future rent, videotapes and

that the agent responded in the negative. Since plaintiff's sole business was the renting of videotapes, competition within the same shopping center was a matter of great concern to her and any competition, or even the potential for competition, would have dissuaded her from executing the lease. In other words, had plaintiff realized that other tenants located in the center at that time could rent videotapes, she would not have entered into her lease with the defendant. This Court does not believe that the leasing agent actually knew at the time he made this representation to the plaintiff that the Winn–Dixie grocery store was renting tapes, nor does the Court believe that he had any inkling that Rite–Aid would later undertake the renting of videotapes. At the time the Winn–Dixie and Rite–Aid leases were negotiated the videotape rental business was practically unknown. Nevertheless, when he negotiated the subject lease agreement with defendant, he was asked specifically about the possibility of other tenants leasing videotapes and, without checking into the matter, he assured the plaintiff that she would be the only business in the shopping center that would be renting videotapes.

" 'In commercial transactions the law has recognized a less stringent standard of liability for fraudulent misrepresentation than the common law action for deceit. One who, in the course of his business, profession, or employment, or during a transaction in which he had a pecuniary interest, supplies false information for the guidance of others in their business transactions is subject to liability for pecuniary loss caused to them by their justifiable reliance upon such information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.... In other words, in business transactions, a defendant can be held liable for negligent misrepresentations.' *Haynes v. Cumberland Builders, Inc.,* 546 SW2d 228 (Tenn.App.1976).

"Defendant's agent provided information to the plaintiff for her guidance. This information was of critical importance to the plaintiff and she justifiably relied upon it.

The issue then becomes, was the representation false? Obviously, Rite–Aid did rent videotapes. Did Rite–Aid have the right under its lease to do so? If it did not, then the leasing agent's representation would not have been false since Rite–Aid would have been renting tapes in violation of its lease. On the other hand, if Rite–Aid had, or arguably had, the authority to rent videotapes, then at the very least the leasing agent's representations were false and negligently made. A discussion of this particular sub-issue necessarily will involve a discussion of the third-party action. Rite–Aid's lease provides

"ARTICLE 8—*Use of Premises*

" 'Tenant shall have the right to use the Premises for the sale of health and beauty aids and/or for the sale of any or all items commonly sold in full line drug stores.'

"The leasing agent takes a rather odd position. He testified that the quoted language from the Rite–Aid lease would not allow Rite–Aid to operate a business that was primarily devoted to videotape rentals, but would allow Rite–Aid to rent videotapes if the tape rentals were only a small or ancillary part of Rite–Aid's business. The portion of Rite–Aid's premises devoted to the rental of videotapes has nothing to do with any of the issues in this litigation. The rental of videotapes may have been an infinitesimally small part of Rite–Aid's business, but it was 100% of plaintiff's business. She located in this strip shopping center to benefit from customer traffic generated by the other stores. *Any* competition in any of the other stores would be deleterious to her business. The shopping center is located far off the highway; her store is rather difficult to see from the highway. Undoubtedly plaintiff has a 'clientele' but just as surely a significant portion of her business is generated by customers of other tenants. If another tenant provides the same service as the plaintiff, and if a potential customer goes into the business of that other tenant first, it is quite likely that the other tenant will service the needs of that customer to the detriment of the plaintiff. In summation

to this point, the fact that videotape rental was a small part of Rite–Aid's business is of no significance whatsoever. did Rite–Aid's lease indeed allow 'ancillary rental' but not the operation of a video store, as the leasing agent suggests? The Court feels that under Rite–Aid's lease, Rite–Aid had the authority to rent videotapes. Admittedly, the word 'sale' is used throughout Article 8 of the Rite–Aid lease. However, it seems clear that the use of that word was rather casual and not intended to prohibit Rite–Aid from renting anything. For example, drug stores frequently rent crutches, wheelchairs, hospital beds and the like. If Article 8 of the lease is to be read as prohibiting any rental of videotapes, it likewise would have to be read as prohibiting rental of wheelchairs and other physical therapy equipment. As noted above, the leasing agent himself does not believe that the lease prohibits incidental or ancillary tape rental which this was, as far as Rite–Aid was concerned. The purported limitation in Article 8 regarding the sale of all items 'commonly sold in full line drug stores' hardly merits mentioning. Drug stores today seemingly sell anything and everything, from antifreeze and motor oil, to barbeque grills and garden hoses, to snack foods and televisions. One has to look hard to find the pharmacy portion. In any event, this particular limitation has no limiting effect in today's context. Therefore, the Court finds Rite–Aid had the authority under its lease agreement with defendant to rent videotapes, at least as an incidental portion of Rite–Aid's business. Incidental or not, the authority of Rite–Aid to rent videotapes to the public rendered false the leasing agent's representation to the plaintiff. The third-party suit should be dismissed.

"Having determined that the representation made by the leasing agent to the plaintiff was false, it must be determined if it was negligently made. The Court is of the opinion that it was. Plaintiff inquired specifically of the agent whether or not other tenants had the authority to rent videotapes. He responded negatively and assuredly felt that he was responding truthfully. However, the agent knew how important this determination was to the plaintiff and further inquiry into the existing leases by the agent would have been indicated. He did not do so. Such actions were negligent and the defendant is liable for any loss suffered by the plaintiff due to the competition of Rite–Aid in the renting of videotapes."

■ The Appellant insists the Plaintiff failed to prove any of the elements necessary to establish a cause of action for negligent misrepresentation. We cannot agree. Negligent misrepresentation is defined in Restatement (Second) of Torts, Section 552, as follows:

(1) One who, in the course of his business, profession or employment, or a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused by [sic] them by their justifiable reliance upon such information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

(2) The liability stated in subsection (1) is limited to loss suffered

(a) By the person or one of the persons for whose benefit and guidance he knows the information is to be intended; and

(b) Through reliance upon it in a transaction in which it is intended to influence his conduct.

The Appellant insists that before the Plaintiff can recover for negligent misrepresentation she must prove that:

1. The defendant supplied information to the plaintiff;
2. The information was false;
3. The defendants did not exercise reasonable care in obtaining or communicating the information; and
4. The plaintiff justifiably relied on the information;

and relies on *Merriman v. Smith,* 599 S.W. 2d 548, 557 (Tenn.App.1979) as supportive of this contention.

Appellant also insists the Plaintiff must prove the representation made is a past or

present fact and is not actionable if based on an opinion or concerning future events even if they are proven to be false. Citing *McElroy v. Boise Cascade Corp.*, 632 S.W. 2d 127 (Tenn.App.1982); *Young v. Cooper*, 30 Tenn.App. 55, 203 S.W.2d 376 (1947); *Brungard v. Caprice Records, Inc.*, 608 S.W.2d 585 (Tenn.App.1980). Appellant says the representations by Mr. Matthews concerned only "future" events. We cannot agree. The chancellor found Mr. Matthews "assured the plaintiff that she would be the only business in the shopping center that would be renting videotapes." We think the record supports this finding by the chancellor.

The Appellant argues the Plaintiff failed to meet the second requirement that the representation was false. It points to Article 8 of Rite–Aid's lease which governs the use of its premises as follows: "ARTICLE 8–Use of Premises. Tenant shall have the right to use the Premises for the sale of health and beauty aids and/or for the sale of any or all items commonly sold in full line drug stores."

If this provision of the lease were the only thing to be looked to, the Appellant's argument would be persuasive. However, the chancellor looked at the lease in a much broader spectrum and, we think, correctly so. It is apparent from the record that neither Rite–Aid nor Mr. Matthews interpreted the provisions in Rite–Aid's lease as prohibiting the leasing of tapes. The chancellor, in his memorandum opinion, speaking to the testimony of Mr. Matthews, said, "He testified that the quoted language from the Rite–Aid lease would not allow Rite–Aid to operate a business that was primarily devoted to videotape rentals, but would allow Rite–Aid to rent videotapes if the tapes were only a small or ancillary part of Rite–Aid's business." The record also reflects that Mr. Matthews did not consider that West–Morr had the right to prohibit Rite–Aid from renting tapes.

We have been cited to no cases in this jurisdiction, nor have we found any, addressing the precise issue of the use to be made of leased premises but generally

The question whether a statement in a lease of the use to be made of the demised premises implies a covenant not to use the premises for other purposes depends on the intention of the parties. The entire lease, not merely the provision in question, should be read to determine whether a restriction was intended. In order to establish a restriction, express language or language from which a restriction is clearly implied must be shown, so that, in the absence of proof of an independent agreement to the effect that a restriction on the use of the premises was the consideration or inducement to the execution of the lease, or in the absence of clear language in the lease indicating a restriction, the terms of a lease not limiting the use of the premises must govern, and the tenant has the right to use the premises for any lawful purpose for which they are adapted.

51 C.J.S., Landlord & Tenant, Sec. 337(b), p. 860. *Also See* 49 Am.Jur.2d, Landlord and Tenant, Sec. 239, p. 255.

In the case of *Ray–Ron Corp. v. DMY Realty Co.*, 500 N.E.2d 1163 (Ind.1986) the Indiana Supreme Court held the operation of seven video machines on the premises leased "for a restaurant and/or retail sale of liquor and associated commissary and for no other purpose or purposes without the written consent of the lessor" did not violate the lease. In reversing the trial court the court said:

A lease of property which specifies the purpose of the lease but does not prohibit other purposes is deemed permissive only. *Silkey v. Malone* (1953), 123 Ind. App. 395, 111 N.E.2d 665. Where, as here, the lease contains a prohibition on other uses, it is deemed restrictive. The lessor is entitled to limit use in accordance with the lease. *Schaub v. Wright* (1921), 79 Ind.App. 56, 130 N.E. 143.

While the definition of a given term of use, such as "restaurant," is a matter of law, the definition necessarily depends upon the commonly accepted meaning and the apparent intent of the parties. *See, Halloran v. Jacob Schmidt Brewing Co.*, 137 Minn. 141, 162 N.W. 1082 (1917). Though the commonly accepted

meaning of words might well be the subject of empirical evidence, courts frequently take notice of the definition of ordinary words. *Schuab,* 79 Ind.App. at 58, 130 N.E. 143. Even where a lessee puts the premises to use in a way outside the term of the lease, such action may not be regarded as a breach if it is casual and intermittent. *Galloway v. Ortega,* 61 Misc.2d 539, 541, 305 N.Y.S.2d 546, 549 (1969) ("one swallow does not a summer make"). Such treatment also seems appropriate for uses which could be deemed incidental to the main purpose of the lease.

*Id.* at 1165.

In the case of *Otting v. Gradsky,* 294 Ky. 779, 172 S.W.2d 554 (1943) the lease provided: "Premises and buildings thereon are to be used as an auto wrecking and sale of automobile parts business." The owner of the property filed suit to enjoin the lessee from "carrying on the business of buying, selling and storing waste paper, scrap iron, scrap metals, waste materials and the general junking business" on the property. The Kentucky Court of Appeals, in reversing the judgment of the trial court for the lessor, said:

A provision in a lease authorizing use for a certain purpose is generally regarded as permissive, instead of restrictive, and does not limit or impliedly forbid their use for similar or related purposes, so long as there does not result an injury of the landlord's rights, or are not expressly forbidden, or violate some statute or ordinance which would subject the lessor to liability. 32 An.Jur. p. 191. Where words used in a lease are descriptive of the character of the premises, although indicating a particular use, the weight of authority is to the effect that such words do not constitute a restriction on the lessee in the use the words may indicate. *Lawrence v. White,* 131 Ga. 840, 63 S.E. 631, 19 L.R.A.,N.S., 966, 15 Ann.Cas. 1097 [ (1909) ]; *Reed v. Lewis,* 74 Ind. 433, 39 Am.Rep. 88 [ (1881) ].

*Id.* at 556.

In the case of *Real Estate Management v. Giles,* 41 Tenn.App. 347, 293 S.W.2d 596 (1956), in addressing the construction of contracts in this jurisdiction, this court said:

Generally, in construing contracts the Courts not only look to the language of the instrument, but must ascertain, if possible, the intention of the parties, and the construction which is fair and reasonable will prevail. *Scott v. McReynolds,* 36 Tenn.App. 289, 255 S.W.2d 401 [ (1952) ]; *Couch v. Couch,* 35 Tenn.App. 464, 248 S.W.2d 327 [ (1951) ]; *Commerce Street Co., Inc., v. Goodyear Tire & Rubber Co., Inc.,* 31 Tenn.App. 314, 215 S.W.2d 4 [ (1948) ]; *Nashville Terminal Co. v. Tennessee Central Ry. Co.,* 2 Tenn.App. 646 [ (1926) ].

*Id.* at 599

Under the facts in the case at bar and under the law applicable to such cases, we cannot say the chancellor was in error in finding Rite–Aid had the right to lease videotapes under the terms of its lease.

Our holding on this issue renders it unnecessary to address Appellant's insistence that Rite–Aid was without authority to rent videotapes and the court was in error in dismissing the third-party complaint against Rite–Aid.

Appellant insists the Plaintiff failed to prove West–Morr's leasing agent was negligent in telling her she would be the only tenant in the shopping center renting videotapes. We cannot agree. Mr. Matthews, in his testimony on cross-examination, took the position that, in his view, not only could Rite–Aid rent videotapes so long as it was a small or ancillary part of its business, but he took the same position when asked about other businesses in the shopping center. Under the circumstances, we hold it was his responsibility to depart this information to the Plaintiff.

Appellant further says the Plaintiff failed to prove she reasonably relied upon Mr. Matthews' representations. Again, we cannot agree with this insistence. The undisputed testimony of the Plaintiff is she would not have leased the premises had she not been assured she would be the only business in the shopping center leasing videotapes.

The Appellant also insists the award of damages was improper because damages were not proved with reasonable certainty and the award was based on alleged loss of gross profits. We are constrained to agree with the Appellant's insistence.

The chancellor, in addressing damages in his memorandum opinion, said: "The issue of damages is troublesome in the extreme. She attempted to prove that her gross receipts from tape rentals dropped precipitously during the time that Rite–Aid rented tapes. The gross receipts indeed show a pattern that is supportive of plaintiff's position. However, damages must be proven with reasonable certainty. Plaintiff has attempted to prove a rather general loss of business during the time Rite–Aid rented tapes. However, an unacceptable amount of speculation would be necessitated on the part of the Court to fix damages on the basis of plaintiff's proof in this regard. Her bookkeeping essentially was nonexistent; she had no business records or income records in the usual sense of those terms. There were never any cash register tapes. The Court is satisfied that plaintiff sustained a loss, but in what amount? The financial records are in such a shambles that the Court hesitates to place any reliance thereon. Further, there are other variables involved that involve speculation, the most significant of which is competition. Videotape rental stores in this area have proliferated. Since plaintiff commenced business a significant number of tape rental stores have opened and a sizeable number of 'Mom and Pop' convenience stores have begun renting videotapes as a sideline. Accordingly, due to the plaintiff's failure to depreciate these tapes (prior to preparation for litigation), the abominable bookkeeping procedures and the lack of cash register tapes, and due to the competitive forces in the marketplace, the Court is precluded from placing any reliance at all on plaintiff's documentation regarding her losses." We concur with this finding by the chancellor.

Then the chancellor made the following further finding: "However, one thing that is known definitely is the amount of tapes rented by Rite–Aid." It is a matter of some conjecture as to whether or not the customers that rented videotapes from Rite–Aid would have rented those same tapes from plaintiff if Rite–Aid had not been in business. Once again we look to the nature of a strip shopping center and the reasons for locating in that center. The plaintiff in large part depended upon 'impulse buying' from customers going to other stores; it can safely be said that a Rite–Aid customer would have walked the few steps necessary to rent a tape from plaintiff if Rite–Aid had no tapes to rent. It also can be safely said that anyone wishing to rent a videotape, and having a choice between plaintiff and Rite–Aid, would have opted for Rite–Aid since the latter rented its tapes far more cheaply than did plaintiff. Rite–Aid garnered 16,858 'tape-days' during the time it rented tapes. Had those tape-days belonged to plaintiff she would have had gross receipts of $25,287.00. Since this figure amounts to gross receipts of which the plaintiff was deprived, operating expenses, employee expenses and the like are irrelevant. Those expenses were incurred even while Rite–Aid was in competition with plaintiff.

"In conclusion, plaintiff shall have and recover of the defendant the sum of $25,287.00. The third-party action of defendant is dismissed."

We cannot agree with this conclusion of the chancellor. The record shows Rite–Aid rented tapes from April, 1986, until June, 1987. When it first started renting tapes it rented them for $0.49 per day. This continued until October when it raised its price to $0.99 per day. In January, 1987, it increased its price to $1.19 per day and this continued until it went out of business in June. The award by the chancellor to the Plaintiff for loss of net profits was arrived at by the Plaintiff's expert witness in the following manner: He took the gross receipts which Rite–Aid received for tape rentals from April until October, 1986, and divided it by $0.47 and concluded Rite–Aid had rented 7,398 tapes during that period of time. He took the gross revenue received by Rite–Aid for tape rentals from October to January and divided that by

$0.99 and concluded Rite–Aid had rented 2,741 tapes during that period of time. He then took the gross receipts received between January and June and divided that by $1.19 and concluded Rite–Aid rented 6,709 tapes during that period of time, for a total of 16,858 tape rentals. He then multiplied that figure by $1.50, which was the amount the Plaintiff was charging per day for tapes, and got $25,287.

We deem this to be an unacceptable method of proving the loss of net profits. This method presupposes that every person who rented a tape from Rite–Aid would have rented the same tape from the Plaintiff. The record is devoid of any evidence that a single tape which was rented from Rite–Aid would have been rented from the Plaintiff. The record shows there are approximately 20 other tape rental establishments in the Morristown and Jefferson City area but there is no showing the tapes rented from Rite–Aid could not have been rented from someone other than the Plaintiff. Although there is an indication in the record that Plaintiff had a good library of tapes in her store, the record fails to show she had the same tapes as those rented from Rite–Aid. Also, there is no showing the customers who rented tapes from Rite–Aid would have paid a higher rental to the Plaintiff for the same tapes. There are so many factors lacking in the proof to show the customers who rented tapes from Rite–Aid would have rented tapes from the Plaintiff had Rite–Aid not been renting tapes that it becomes speculation, surmise and conjecture to say this rises to the posture of proving lost profits to the Plaintiff.

The landmark case in this jurisdiction on the element of proof for recovery of loss of profits is *Morristown Lincoln–Mercury, Inc., v. Roy N. Lotspeich Publishing Co.*, 42 Tenn.App. 92, 298 S.W.2d 788 (1956). In addressing this issue, the court said:

> It appears to be the rule in this State, as generally elsewhere, that lost or expected profits are recoverable as damages for breach of contract, provided they can be proved with reasonable certainty, and are not in fact remote or speculative. *Burge Ice Machine Co. v. Strother*, 197 Tenn. 391, 273 S.W.2d 479

[(1954)]; *Black v. Love & Amos Coal Co.*, 30 Tenn.App. 377, 206 S.W.2d 432 [(1947)]; *Hagan v. Nashville Trust Co.*, 124 Tenn. 93, 136 S.W. 993 ([1911)]; *McWhirter v. Douglas*, 41 Tenn. 591 [(1860)]; 15 Am.Jur., Sec. 150, p. 558; 25 C.J.S., Damages, §§ 42, 43, pp. 516, 519.

In 15 Am.Jur., the rule is stated, as follows:

> "As in the case of damages generally, to warrant a recovery for loss of profits in actions either for breach of contract or for tort, they must be capable of proof with reasonable certainty, and no recovery can be had for loss of profits which are uncertain, contingent, conjectural, or speculative. Thus, no recovery can be had for loss of profits where it is uncertain whether any profit at all would have been made by the plaintiff." Sec. 150, p. 558.

*Id.* 298 S.W.2d at 793. *Also see, Burge Ice Machine Company v. Strother*, 197 Tenn. 391, 273 S.W.2d 479 (1954); *Haynes v. Cumberland Builders, Inc.* 546 S.W.2d 228 (Tenn.App.1976); *Joy Floral Company v. South Central Bell*, 563 S.W.2d 190 (Tenn.App.1977); *Anderson–Gregory Company v. Lea*, 51 Tenn.App. 612, 370 S.W.2d 934 (1963).

The Appellee cites *Acuff v. Vinsant*, 59 Tenn.App. 727, 443 S.W.2d 669 (1969); *Coverdell v. Mid–South Farm Equipment Assoc., Inc.*, 335 F.2d 9 (6th Cir., 1964); *Cummings v. Brodie*, 667 S.W.2d 759 (Tenn. App.1983) and *Provident L. & A. Ins. Co. v. Globe Ind. Co.*, 156 Tenn. 571, 3 S.W.2d 1057 (1928) as supportive of the chancellor's holding. However, none of the claims in these cases are predicated on loss of net profits.

We find the record fails to show what loss of net profits, if any, the Plaintiff sustained as a result of Defendant's negligent misrepresentation. However, Plaintiff is entitled to nominal damages.

> "Upon breach of a valid and binding contract, the law infers some damages, and generally the person guilty of the breach is liable at least for nominal dam-

ages, if actual damages cannot be proved. Nominal damages only are recoverable upon the breach of a contract if no actual or substantial damage resulted from the breach or no damage has been or can be shown, as, for example, *where actual damage is uncertain or not susceptible of proof or is too remote, conjectural, and speculative to form the basis of a legal recovery, * * *.*" (Emphasis original.)

*Morristown Lincoln–Mercury v. Roy N. Lotspeich Pub. Co.,* 42 Tenn.App. 92, 298 S.W.2d at 795.

We, accordingly, modify the decree of the chancellor and fix Plaintiff's nominal damages at $500. To the extent the decree of the chancellor is not modified, it is affirmed. The cost of this appeal is taxed one-half to the Appellant and one-half to the Appellee. The case is remanded for the entry of a decree in keeping with this opinion.

GODDARD and ANDERSON, JJ., concur.